RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0095P (6th Cir.)
File Name: 03a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　*v.*

KRYSTAL T. LAYNE
(01-6288); WILLIAM DICK
(01-6399),
　　　*Defendants-Appellants.*

Nos. 01-6288/6399

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 01-00042—Curtis L. Collier, District Judge.

Submitted: March 14, 2003

Decided and Filed: April 1, 2003

Before: COLE, GILMAN, and BRIGHT, Circuit Judges.[*]

———————

**COUNSEL**

**ON BRIEF:** R. Dee Hobbs, BELL & HOBBS, Chattanooga,
Tennessee, Rita C. LaLumia, FEDERAL DEFENDER

---

[*] The Honorable Myron H. Bright, Senior Circuit Judge of the United
States Court of Appeals for the Eighth Circuit, sitting by designation.

SERVICES OF EASTERN TENNESSEE, INC.,
Chattanooga, Tennessee, for Appellants. Paul W. Laymon,
Jr., ASSISTANT UNITED STATES ATTORNEY,
Chattanooga, Tennessee, for Appellee.

———————

**OPINION**

———————

R. GUY COLE, JR., Circuit Judge. Defendants-Appellants
William Dick and Krystal Tate Layne ("Defendants") were
convicted of conspiracy to manufacture methamphetamine
with the intent to distribute the same. Defendants now appeal
the sentences they received as a result of the district court's
application of United States Sentencing Guidelines
("Guidelines") § 2D1.1(b)(6)(A) in their cases. Defendants:
(1) complain that the district court erroneously concluded that
they operated a methamphetamine laboratory that posed a
substantial risk of harm to human life, triggering the
application of § 2D1.1(b)(6)(A); and (2) challenge the
constitutionality of § 2D1.1(b)(6)(A) under the Fifth
Amendment's Due Process Clause and the Eighth
Amendment. As explained in more detail below, we now
**AFFIRM** the judgment of the district court.

## I. BACKGROUND

The essential facts in this case are undisputed. On
February 21, 2001, based on information obtained from a
confidential informant, law enforcement officers of the
Chattanooga, Tennessee Police Department and the local
Drug Enforcement Agency office obtained and executed a
search warrant on an apartment rented by William Dick on
Mountain Creek Road in Chattanooga, Tennessee. Upon
executing the warrant, the officers discovered Krystal Tate
Layne and Bryan Ritchie in the apartment. Ritchie had
ephedrine in his pants and Layne had methamphetamine in
her mouth. Dick returned shortly after the officers arrived.

Dick, Layne, and Ritchie had been in the process of manufacturing methamphetamine using the ephedrine reduction method. When the warrant was executed, they had finished the "cooking" process and were waiting for the liquid methamphetamine produced to cool so that they could separate certain liquids and gas from the mixture. During the search, the officers recovered various items, including flammable and toxic chemicals commonly used during the cooking process, from throughout Dick's apartment.

Defendants had been operating this methamphetamine laboratory in Dick's apartment for at least two weeks. The apartment was located in a densely settled area. Defendants used methamphetamine while operating the laboratory, which made the operation more dangerous. The ephedrine reduction method of manufacturing methamphetamine involves the use of numerous dangerous and toxic chemicals, and creates, as byproducts, toxic gases, which are carcinogenic when inhaled. By the time of the search, Defendants had reached the stage of the process during which toxic, carcinogenic phosphine or phosgene gas is produced, but had not yet reached the final stage of the manufacturing process during which hydriodic gas, which is also toxic, is produced.

Dick and Layne were charged, along with Ritchie, whose appeal is not now before this Court, in a March 13, 2001 indictment alleging that the trio conspired, in violation of 21 U.S.C. § 846, to attempt to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1). On May 18, 2001, Dick and Layne each pleaded guilty to the single count against them.

On October 5, 2001, the district court held a sentencing hearing at which it considered Defendants' timely objections to the application of Guideline § 2D1.1(b)(6)(A) in their cases. Section 2D1.1(b)(6)(A), which is now found at § 2D1.1(b)(5)(B), but remains substantially similar, applies where the offense involved a methamphetamine laboratory that caused a substantial risk of harm to human life or the

environment. When applicable, the provision generally requires a three-level increase of a defendant's offense level. However, if an increase of three levels will not result in an offense level of twenty-seven, this provision provides that the offense level should be automatically increased to twenty-seven.

After hearing testimony and argument, the district court concluded that the offense committed by Defendants involved the operation of a methamphetamine laboratory that created a substantial risk of harm to human life, and, therefore, denied Defendants' objections to the application of § 2D1.1(b)(6)(A).

The district court attributed 19.4 grams of methamphetamine mixture to each of Defendants. As a result, Defendants each had a Base Offense Level of eighteen. The district court then applied the specific offense characteristic set out in § 2D1.1(b)(6)(A) and increased each of Defendants' offense levels by nine, to twenty-seven. The district court next adjusted Defendants' offense levels downward by three levels for acceptance of responsibility pursuant to Guideline §§ 3E1.1(a), (b), to reach a Total Offense Level of 24. Defendants were each found to be in Criminal History Category IV.[1] The district court sentenced Defendants each to serve eighty-seven months of imprisonment followed by three years of supervised release. The district court later memorialized its ruling in a November 13, 2001 memorandum and order.

---

[1]A Total Offense Level of 24 and a Criminal History Category of IV yield a sentence between seventy-seven and ninety-six months' imprisonment.

## II. ANALYSIS

### A. Application of § 2D1.1(b)(6)(A)

When reviewing the application of the Sentencing Guidelines, we review a district court's findings of fact for clear error. *United States v. Middleton*, 246 F.3d 825, 844-45 (6th Cir. 2001). The underlying facts in this case are uncontested. Whether the district court properly found the existence of a substantial risk of harm to human life or the environment within the meaning of § 2D1.1(b)(6)(A) is a mixed question of law and fact, and, as such, it is subject to *de novo* review. *See United States v. Georgia*, 279 F.3d 384, 386-87 (6th Cir. 2002). Once the district court has found the existence of a substantial risk of harm, the application of § 2D1.1(b)(6)(A) is mandatory and is reviewed *de novo. Cf. United States v. Chance*, 306 F.3d 356, 389 (6th Cir. 2002) (discussing Guidelines § 3C1.1, the obstruction of justice enhancement). The application of § 2D1.1(b)(6)(A) is an issue of first impression as neither this Court nor any of our sister circuits have addressed its application.

At the time of the offense committed in this case, February 21, 2001, Guideline § 2D1.1(b)(6)(A) read:

> If the offense (i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk of harm to (I) human life other than a life described in subsection (b)(6)(B)[, which concerns harm to a minor or incompetent]; or (II) the environment, increase by 3 levels. If the resulting offense level is less than level 27, increase to level 27.

U.S. SENTENCING GUIDELINES MANUAL, supp. to app. C, amendment 608 (2001).

Section 2D1.1(b)(6)(A) was created by an emergency amendment to the Guidelines, Amendment 608, effective December 16, 2000. *Id.* Amendment 608 was intended to address "the directive in section 102 (the 'substantial risk

directive') of the Methamphetamine and Club Drug Anti-Proliferation Act of 2000 . . . , Pub. L. 106-878." *Id.*[2] The Methamphetamine Anti-Proliferation Act of 2000 (the "Act") required that the Sentencing Commission accomplish the following:

> [I]n carrying out the substantial risk directive to provide the following enhancements— . . . (A) if the offense created a substantial risk of harm to human life (other than a life described in subparagraph (B)) or the environment, increase the base offense level for the offense—
> (i) by not less than 3 offense levels above the applicable level in effect on the date of the enactment of this Act; or
> (ii) if the resulting base offense level after an increase or under clause (I) would be less than level 27, to not less than level 27 . . . .

*Id.*

The Act was designed to stop the "methamphetamine epidemic in America." H.R. REP. 106-878, at *22 (Sept. 21, 2000). The House of Representatives explained the hazards associated with the "dangerous manufacturing process" for methamphetamine:

> [M]ethamphetamine can be made from readily available and legal chemicals and substances, and . . . it poses serious dangers to both human life and to the environment. . . . these chemicals and substances are utilized in a manufacturing process that is unstable, volatile, and highly combustible. Even small amounts of these chemicals, when mixed improperly, can cause

---

[2]The Sentencing Commission was apparently referring to § 102 of the Methamphetamine and Club Drug Anti-Proliferation Act of 2000, H.R. REP. 106-878, dated September 21, 2000, which, on October 17, 2000, was enacted as § 3612 of the Methamphetamine Anti-Proliferation of 2000, Pub. L. No. 106-310, 114 Stat. 1101.

explosions and fires. For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks, or sewage systems in an effort to conceal evidence of illegal manufacturing. More disturbing is that most of these laboratories are situated in residences, motels, trailers, and vans, and often times are operated in the presence of children.

*Id.* at *22-*23.

The Act did not define "substantial risk of harm," so the Sentencing Commission provided factors to be considered in determining whether a substantial risk of harm was posed. U.S. SENTENCING GUIDELINES MANUAL, supp. to app. C, amendment 608 (2001). In particular, Application Note 21(A) to the former § 2D1.1 listed the following factors that a court may consider when determining the existence of a substantial risk of harm within the meaning of § 2D1.1(b)(6):

(A) Factors to Consider.—In determining, for purposes of subsection (b)(6), whether the offense created a substantial risk of harm to human life or the environment, the court may consider factors such as the following:

(i) The quantity of any chemicals or hazardous or toxic substances found at the laboratory, or the manner in which the chemicals or substances were stored.

(ii) The manner in which hazardous or toxic substances were disposed, or the likelihood of release into the environment of hazardous or toxic substances.

(iii) The duration of the offense, or the extent of the manufacturing operation.

(iv) The location of the amphetamine or methamphetamine laboratory (*e.g.*, in a residential

neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

*Id.*

Effective November 1, 2001, the Sentencing Commission promulgated Amendment 620, a permanent amendment to § 2D1.1(b)(6). *See* U.S. SENTENCING GUIDELINES MANUAL, supp. to app. C, amendment 620, at 198 (2001) ("This permanent amendment re-promulgates, with modifications, the emergency amendment regarding the substantial risk directive."). As noted previously, pursuant to this second amendment, the substance of former § 2D1.1(b)(6)(A) is found at § 2D1.1(b)(5)(B). *Id.* Amendment 620 also made consideration of the factors set out in the Application Notes to § 2D1.1(b)(6) mandatory. *Id.*; *see also* U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(b)(5)(B) & cmt. n.20 (2001) (re-designating Application Note 21(A) as Note 20(A) and amending it to strike certain language). Amendment 620 also made mandatory the consideration of both the manner of disposal and the likelihood of release set out in factor (ii), as well as both the duration of the offense and the extent of the operation as set out in factor (iii). U.S. SENTENCING GUIDELINES MANUAL, supp. to app. C, amendment 620 (2001); *see also* U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(b)(5)(B) & cmt. n.20 (2001).

An evaluation of the four relevant factors demonstrates that the methamphetamine laboratory in this case posed a substantial risk of harm to human life.

1.  **Quantity of Chemicals or Hazardous or Toxic Substances and Manner of Storage.**

As the district court found, Defendants admitted to manufacturing methamphetamine. The ephedrine reduction method used by Defendants requires a source of heat and a series of chemical reactions. Certain of the chemicals used in this process are toxic and inherently dangerous. During the manufacturing process, some of these chemicals, which are

highly flammable, present a threat of explosion. These chemicals pose an additional risk should anything go wrong during the manufacturing process. The process produces toxic gases, which pose a serious risk to those who inhale them, and other dangerous byproducts.

Numerous hazardous and toxic substances and chemicals were recovered from Dick's apartment. The search turned up a gallon of muriatic acid, a number of jars of clear and two-layered liquids, tubing that suggested Defendants were attempting to produce hydrogen gas, materials containing red phosphorus residue, empty gallon containers for acetone and Coleman fuel, two to three ounces of crystal iodine, and objects with white residue believed to be methamphetamine.

Acetone, Coleman fuel, and red phosphorus are flammable and can be explosive. Muriatic gas is a toxin that can cause severe burns. Crystalized iodine is hazardous. Many of these chemicals emit dangerous fumes and vapors. The byproduct of the process includes highly flammable and explosive phosphine gas. In this case, the law enforcement officers conducting the search smelled chemicals when they entered Dick's apartment. Neighbors also complained that they smelled odors similar to "nail polish," which was likely the smell of acetone.

The quantity of these chemicals was the amount necessary to manufacture a couple of ounces of methamphetamine. These chemicals, some of which had already been used and others which were being used in the cooking process, were not stored. Rather, the chemical containers, some full and some empty, were found throughout Dick's apartment. Although these chemicals are probably typical of those used in indoor methamphetamine labs, the inherent danger of the chemicals found in Dick's apartment militates in favor of applying § 2D1.1(b)(6)(A) here.

### 2.  Manner of Disposal and Likelihood of Release into Environment.

A law enforcement officer testified that, in laboratories such as this one, the methamphetamine producers usually dispose of waste through drains in the apartment. It is not clear, however, that this occurred here. Although it seems likely that Defendants disposed of hazardous chemicals via the drains in the apartment, it is not clear what impact such disposal would have had on the environment. Accordingly, this factor is indeterminate.

### 3.  Duration of the Offense and Extent of the Manufacturing Operation.

Defendants had been operating this methamphetamine laboratory for at least two weeks, and perhaps several weeks. The district court concluded that Defendants possibly had manufactured several batches of methamphetamine. A law enforcement officer testified that there was nothing unusual about this laboratory. Thus, like the first factor, this factor does not suggest that the laboratory at issue was extraordinary, but nevertheless militates in favor of application of § 2D1.1(b)(6)(A), which was designed to address the inherent dangers of methamphetamine manufacturing. *See* Methamphetamine and Club Drug Anti-Proliferation Act of 2000, H.R. REP. 106-878, at *22-*23 (Sept. 21, 2000).

### 4.  Location of the Laboratory and the Number of Human Lives Placed at Substantial Risk of Harm.

Defendants' laboratory was located in a heavily populated area, rather than a remote area. The Guidelines make the distinction between "residential neighborhood[s]" and "remote area[s]" relevant, if not important. *Compare* U.S. SENTENCING GUIDELINES MANUAL, supp. to app. C, amendment 608, at 86 (2001), *with* U.S. SENTENCING GUIDELINES MANUAL, supp. to app. C, amendment 620, at 196 (2001). The laboratory was in Dick's apartment, which

itself is in a large apartment complex in a densely settled area near a number of other apartment complexes. Dick's apartment is within an eight-unit structure. At the time the search warrant was executed–while Defendants manufactured methamphetamine–the other seven units were occupied. An elementary school is housed nearby, and a creek flows through the apartment complex and empties into the Tennessee River.

Dick's neighbors could smell fumes, at least from the acetone, coming from his apartment. Thus, the laboratory here clearly posed an inhalation risk not only to Defendants and Ritchie, but also to others. Moreover, Defendants' use of methamphetamine while they manufactured it clearly heightened the risk of danger posed by the operation, given the highly explosive and toxic materials involved. This factor strongly militates in favor of application of § 2D1.1.

Viewing the first, third, and fourth factors together, it appears that the laboratory placed numerous people at substantial risk of serious harm.[3]

## B. Whether the Application of § 2D1.1(b)(5)(B) is Unconstitutional

Defendants challenge the constitutionality of the application of § 2D1.1(b)(6)(A) as a violation of the Due Process Clause of the Fifth Amendment. Layne also challenges the constitutionality of this provision under the Eighth Amendment. We review *de novo* constitutional

---

[3]Focusing on this Court's unpublished decision in *United States v. Stewart*, 5 Fed. Appx. 402, **8-**9 (6th Cir. Feb. 27, 2001), Layne urges us to consider case law interpreting 21 U.S.C. § 858, which makes it unlawful to endanger human life while illegally manufacturing a controlled substance, in assessing whether the methamphetamine laboratory in this case posed a substantial risk of harm to human life within the meaning of § 2D1.1(b)(6)(A). However, we find that case law addressing § 858 is not binding and offers only minimal guidance given that we must be substantially guided by the commentary to § 2D1.1.

challenges to sentences because these challenges present questions of law. *See United States v. Smith*, 73 F.3d 1414, 1417 (6th Cir. 1996) (citing *United States v. Knipp*, 963 F.2d 839, 843 (6th Cir. 1992)).

### 1. Due Process Clause

Without citation to case law, Defendants argue that the application of § 2D1.1(b)(6)(A), which resulted in nine-level increases to each of their offense levels, had an extremely disparate impact on their sentences. Defendants argue that this provision creates disparate sentencing results by increasing the offense level of a less culpable defendant many more levels than it increases the offense level of a defendant involved in a more serious offense, without considering evidence of mitigating circumstances.

In particular, Defendants direct our attention to the disparity that results from application of this provision to defendants whose total offense level would be 24 or more and those, such as Defendants here, whose total offense level would be less than 24. The former receive a three-level increase. The latter automatically receive a total offense level of 27. Thus, because Defendants' offense levels were 18, the application of § 2D1.1(b)(6)(A) automatically resulted in offense levels of 27. Defendants claim that the nine-level increase they each received as a result of the application of § 2D1.1(b)(6)(A) is disproportionate to the increase another (more culpable) defendant with a higher offense level–that is, an offense level of 24 or more—would have received.

The disparate impact of a sentencing factor will violate the Due Process Clause only where the applicable statute appears to have been tailored to permit the finding of that particular factor "to be a tail which wags the dog of the substantive offense." *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). Thus, the disparate sentencing impact resulting from the district court's finding that the subject laboratory created a substantial risk of harm to human life will violate due process

only if § 2D1.1(b)(6)(A) permits this finding to decidedly overshadow the underlying offense.

Generally, due process requires that courts find the presence of a sentencing factor by a preponderance of the evidence. *McMillan*, 477 U.S. at 91 (rejecting an argument that the sentencing factor, the visible possession of a firearm, must be proven by clear and convincing evidence). However, if the sentencing factor does eclipse the underlying offense, a higher standard of proof may be required. For example, when a judge's finding of a sentencing factor by a mere preponderance of the evidence "authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.'" *Apprendi v. New Jersey*, 530 U.S. 466, 495 (2000) (citing *McMillan*, 477 U.S. at 88). Thus, due process requires that "[a]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt." *Id.* at 490, 494 n.19; *see also United States v. Graham*, 275 F.3d 490, 517 n.19 (6th Cir. 2001), *cert. denied*, 535 U.S. 1026 (2002).

Defendants were each sentenced to serve eighty-seven months in prison. These penalties are well below the applicable twenty-year statutory maximum. *See* 21 U.S.C. §§ 841(b)(1)(C), 846. Although this suggests that § 2D1.1(b)(6)(A) does not violate the Due Process Clause, the Supreme Court has acknowledged that there is a "divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." *United States v. Watts*, 519 U.S. 148, 156 & n.2 (1997) (finding no "exceptional circumstances" requiring proof by clear and convincing evidence where court considered acquitted conduct as relevant conduct).

Defendants urge us to adopt the Ninth Circuit's conclusion that proof by clear and convincing evidence is required in exceptional cases, *see United States v. Hopper*, 177 F.3d 824,

833 (9th Cir. 1999), and to find this such an exceptional case. Such an exceptional case arises, under the law of the Ninth Circuit, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction." *United States v. Restrepo*, 946 F.2d 654, 659 (9th Cir. 1991) (en banc).

However, under circumstances similar to this case, this Court has explicitly rejected the approach that Defendants now urge us to adopt, stating: "We do not believe that a higher standard of proof is required simply because the enhancement would significantly increase the defendant's sentence." *Graham*, 275 F.3d at 517 n.19; *see also United States v. Silverman*, 976 U.S. 1502, 1517-18 (6th Cir. 1992) (en banc). *Graham* rejected the holding of *United States v. Kikumura*, 918 F.2d 1084, 1100-01 (3d Cir. 1990), that: "[I]n extreme situations, where 'the magnitude of a contemplated departure is sufficiently great that the sentencing hearing can be characterized as a tail which wags the dog of the substantive offense,' a district court's factual findings regarding the enhancement must satisfy a higher standard of proof than mere preponderance." *See Graham*, 275 F.3d at 517 n.19 (internal citations omitted). In *Kikumura*, the Third Circuit had required proof by clear and convincing evidence for a twelve-fold, 330-month sentencing departure based upon promotion of terrorism. 918 F.2d at 1100-01.

In *Graham*, this Court concluded that the government need not prove by clear and convincing evidence that § 3A1.4 of the Guidelines applied. *Id.* Section 3A1.4 is similar in effect to the provision at issue in this case. In particular, § 3A1.4 provides that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32." U.S. SENTENCING GUIDELINES MANUAL § 3A1.4. Because § 3A1.4 authorizes a greater increase and, therefore, potentially causes a greater disparity than does § 2D1.1(b)(6)(A), the argument for a higher standard of proof in *Graham* was more compelling than it is

in this case. Accordingly, *Graham*'s rejection of the clear and convincing standard counsels that it would be inappropriate to adopt that standard in this case.

In any event, Defendants' argument that the district court applied the wrong standard because it assessed whether there was evidence of a substantial risk of harm to human life by a preponderance of the evidence, rather than by clear and convincing evidence, is without merit. The district court found by "clear and convincing evidence . . . [that] Defendants' laboratory created a substantial risk of harm to human life." Thus, even if we did require application of this higher standard of proof, Dick's argument that the district court employed the wrong standard in this case still would not succeed because the district court, in an abundance of caution, applied the higher standard.

### 2. Eighth Amendment

Second, Layne argues, without citation to case law, that § 2D1.1(b)(6)(A) violates the Eighth Amendment's prohibition against cruel and unusual punishment to the extent that its application results in disproportionate sentences. In *Harmelin v. Michigan*, a plurality of the Supreme Court concluded that the Eighth Amendment "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." 501 U.S. 957, 1001 (1991) (Kennedy, J., joined by O'Conner, J., and Souter, J., concurring) (citing *Solem v. Helm*, 463 U.S. 277, 288 (1983)); *see also United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000).

Courts assessing whether the Eighth Amendment's limited guarantee of proportionality has been satisfied must "grant substantial deference to the . . . legislatures . . . in determining the types and limits of punishments for crimes." *Harmelin*, 501 U.S. at 999 (citing *Solem*, 463 U.S. at 290). Thus, "[a] sentence within the maximum set by statute generally does

not constitute cruel and unusual punishment." *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (citing *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1994)). As noted previously, Layne's sentence was well below the twenty-year statutory maximum.

"The Sixth Circuit has adopted the 'narrow proportionality principle' of *Harmelin*. Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583. Therefore, we look to whether a sentence is "extreme" and "grossly disproportionate" to assess whether the Eighth Amendment has been violated. *Austin*, 213 F.3d at 302 (finding sentence of forty to sixty years for second degree murder conviction, where range under Guidelines was twelve to twenty-five years, neither extreme nor grossly disproportionate). In this case, Layne's eighty-seven-month sentence cannot be said to be either "extreme" or "grossly disproportionate" to the crime that she committed.

Layne complains, however, of the lack of proportionality–not between the crime she committed and the punishment she received, but between herself and others convicted of the same crime. Layne claims the Eighth Amendment is violated when one person receives only a three-level increase in their sentence as a result of § 2D1.1(b)(6)(A) but others receive a nine-level increase as a result of the application of the same provision. However, the Supreme Court has concluded that comparative proportionality is not mandated by the Constitution. *See Pulley v. Harris*, 465 U.S. 37, 43-45 (1984) (concluding that non-traditional proportionality review, which sought to require courts to assess "whether [a] penalty is . . . unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime[,]" is not constitutionally mandated); *see also Harmelin*, 501 U.S. at 1004-05 (Kennedy, J., O'Conner, J., Souter, J., concurring) ("*Solem* is best understood as holding that comparative analysis within and between jurisdictions is

not always relevant to proportionality review." [Although] "it *may* be helpful," *Solem* "did not mandate such inquiries."). This Court has agreed that comparative proportionality is not constitutionally mandated. *See Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2002) (citing *Pulley*, 465 U.S. at 44-51); *Coe v. Bell*, 161 F.3d 320, 352 (6th Cir. 1998) (citing *Pulley*, 465 U.S. at 44-45). Accordingly, we are not persuaded by Layne's argument that her sentence runs afoul of the Eighth Amendment merely because it is disproportionate to the sentences received by others who committed the same or similar crimes.

### III.  CONCLUSION

For the reasons stated above, we hereby AFFIRM the sentences imposed by the district court.