NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0269n.06
Filed: April 8, 2005

Nos. 03-6667/04-5044

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| RHONDA BIVENS; GREGORY BIVENS, | ) | District of Tennessee |
| | ) | |
| Defendants-Appellants. | ) | |

Before:     BOGGS, Chief Judge; and COOK and BRIGHT, Circuit Judges.*

    PER CURIAM.    Gregory and Rhonda Bivens, husband and wife, appeal the

sentences imposed by the district court after they were convicted of conspiracy to manufacture

methamphetamine, and other related offenses. They claim that the district court erred in imposing

a sentencing enhancement based on the substantial risk of harm to the Bivenses' children caused by

the Bivenses' methamphetamine production, and also in denying Rhonda Bivens a reduction for

playing only a minor role in the conspiracy. They also claim that their sentences are

unconstitutional in light of *United States v. Booker*, 543 U.S. __, 125 S. Ct. 738 (2005). For the

reasons that follow, we hold that the district court correctly applied the substantial risk enhancement

_____

    *The Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting
by designation.

to the Bivenses' sentences and did not err in denying a mitigating role adjustment to Rhonda Bivens, but remand for resentencing under the now-advisory United States Sentencing Guidelines.

**I**

On April 3, 2003, the McMinn County, Tennessee, Sheriff's Department executed a search warrant at the Bivenses' residence. The officers found Rhonda and Gregory present. The Bivenses' two children were at school. The officers smelled a chemical odor associated with the manufacture of methamphetamine. Rhonda Bivens, smelling of chemicals, and under the influence of methamphetamine, screamed at the officers and tried to fight them, forcing them to subdue her.

Inside the house, in a room next to the children's bedroom, the officers found, among other things, digital scales, baggies, a propane torch, pill grinders, a methamphetamine recipe, 8.4 grams of methamphetamine, and five firearms. Two of the guns were loaded and in an unlocked drawer, although Rhonda Bivens claimed that the drawer was normally locked. This room was separated from the children's room by a boarded-up window.

In a garage, fifty feet from the house, officers found large amounts of methamphetamine lab components, including muriatic acid, iodine, book matches, coffee filters, propane, and acetone. Seven "burn pits" were found throughout the yard, and twenty-five bags of garbage were found in Gregory Bivens's pickup truck.

On August 4, 2003, Rhonda Bivens pleaded guilty to conspiracy to manufacture methamphetamine on April 3, 2003, and possession of a firearm while using narcotics. On the same date, Gregory Bivens pleaded guilty to those two counts, and also to two other counts: possessing equipment and materials used in the manufacture of methamphetamine, and possessing a firearm

while a felon. Gregory Bivens admitted manufacturing methamphetamine on a regular basis, although he claimed that the only part of the process that took place in the house was the crushing of pills. Rhonda Bivens admitted helping her husband by purchasing chemicals and equipment. Both defendants claimed that they only manufactured methamphetamine when the children were not home.

The Bivenses objected to the drug amounts attributed to them, and to the six-level enhancement they received pursuant to United States Sentencing Guidelines Manual ("USSG") §2D1.1(b)(5)(C) for creating a substantial risk of harm to their children by manufacturing methamphetamine. Rhonda Bivens also claimed she was entitled to a mitigating role adjustment pursuant to USSG §3B1.2 because she played only a minimal to minor role in the conspiracy.

At the sentencing hearing, DEA Special Agent Isom testified that approximately one pound of methamphetamine could be produced from the chemicals found on the Bivenses' premises. He also testified about the inherent dangers of methamphetamine production, including the risk of explosion and the deadly chemical gases produced during production, both of which, he testified, are potentially harmful to children. He acknowledged, though, that he based his testimony on his general knowledge of the methamphetamine production process and the reports of the officers who arrested the Bivenses. He admitted that he had no personal knowledge of their particular laboratory or methamphetamine production.

Rhonda Bivens testified that her husband used a non-standard methamphetamine formula that resulted in lower than usual yields (and therefore a lower drug quantity for sentencing purposes), and that because of his poor math skills she had to help him compute the chemical

amounts needed for each cook. She also testified that the day they were arrested she had convinced her husband to stop cooking methamphetamine, and that the bags of garbage in his truck were the drug manufacturing items they intended to throw away. She attributed most of the lab components found in the garage (which was kept locked, but with a hidden key nearby) to a third-party associate of the Bivenses, and claimed that the children were never present when the drug was produced, or when any manufacturing waste was burned or destroyed. She also claimed that the children were not allowed in the room where pills were ground and the weapons and methamphetamine were stored. Finally, she testified that the children were taken to hospital after the Bivenses' arrest, and that to her knowledge they did not test positive for methamphetamine.

After hearing the above testimony, the district court made several findings. First, the court reduced the amount of drugs attributable to the Bivenses in light of Rhonda Bivens's testimony about the low-yield formula. Second, the court concluded that both Rhonda and Gregory Bivens should receive an enhancement for the substantial risk of harm to their children caused by their manufacturing activities. The court applied each of the factors required by USSG §2D1.1 in order to find substantial risk of harm, finding that the Bivenses possessed a large quantity of hazardous chemicals, that the manufacturing activities took place over a long period of time, that some of the items used to manufacture methamphetamine were located in the house in close proximity to the children, that the Bivenses' addiction to methamphetamine and use of a propane torch to smoke the drug in the house added to the danger to the children, and that the close proximity to the house of the garage lab created a danger to the children because of the fumes generated. Third, the court found that Rhonda Bivens had not played a minor role in the conspiracy, given her admitted

involvement in the manufacturing process, her help in calculating the amount of chemicals needed, and her profiting from the manufacture of finished methamphetamine.

The district court calculated Rhonda Bivens's guideline range to be 108-135 months, and sentenced her to 108 months of imprisonment. The court calculated Gregory Bivens's guideline range to be 121 to 151 months, and sentenced him to 121 months of imprisonment.

The Bivenses timely appealed. Gregory and Rhonda Bivens both appeal the imposition of a six-level enhancement for putting their children at substantial risk of harm. Rhonda Bivens also appeals the district court's denial of her request for a reduction based on her claimed minor role in the conspiracy. In addition, the Bivenses claim that their sentences are unconstitutional in light of *United States v. Booker*.

## II

"Whether the district court properly found the existence of a substantial risk of harm to human life or the environment within the meaning of [USSG] §2D1.1(b)(6)(A) is a mixed question of law and fact, and, as such, it is subject to *de novo* review." *United States v. Layne*, 324 F.3d 464, 468 (6th Cir. 2003).[1] Although it is no longer mandatory that defendants be sentenced in accordance with the United States Sentencing Guidelines, sentencing courts must continue to give consideration to the Guidelines. *See Booker*, 125 S. Ct. at 757, 764-65. Thus, it remains an important part of our

---

[1]The guidelines section then numbered 2D1(b)(6)(a), which referred to harm to both minors and the environment, has subsequently been split into multiple sections dealing with the environment, minors, and human life in general. In 2003, the section dealing with harm to minors was §2D1.1(b)(5)(C). It has subsequently been moved to §2D1.1(b)(6)(C), with no changes to the relevant text.

appellate review function to determine what the Guidelines would call for under the particular facts

and circumstances of a given case. *United States v. Bruce*, 396 F.3d 697, 711 (6th Cir. 2005). This

court must review the district court's statutory construction and interpretation of the now-advisory

sentencing guidelines de novo. *United States v. Chriswell*, __ F.3d __, 2005 WL 627557, 2005 U.S.

App. LEXIS 4509, at *12 (6th Cir. Mar. 18, 2005) (citing *United States v. Bazel*, 80 F.3d 1140, 1141

(6th Cir. 1996)).

In the 2003 edition of the Sentencing Guidelines, §2D1.1(b)(5)(C) stated that: "If the offense

(i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk

of harm to the life of a minor or an incompetent, increase by 6 levels. If the resulting offense level

is less than level 30, increase to level 30." Application Note 20(A) to that section lists the following

factors that a court must consider when determining the existence of a substantial risk of harm:

> (i) The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored.
> (ii) The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.
> (iii) The duration of the offense, and the extent of the manufacturing operation.
> (iv) The location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

The district court considered each of these factors as follows:

> I have to look at the factors which are set out in Application Note 20 to Section 2D1.l on Page 134 of the guidelines book.
>      One of those factors is the quantity of the chemicals, hazardous waste, or toxic substances found at the laboratory. Well, you've got a large quantity here . . . .
>      The next is, as has been pointed out, the duration of the offense. Of course, there were children living here. And the duration is relatively long. You're talking about five, about a five-month, six-month, five, six-month period from November

to April. And so all of the time that during this time that they were making and using methamphetamine during this period of time, you had children living there. Some items, I think, it's worthy of pointing out were stored in the house. You had some methamphetamine in the house . . . .

And we do know, also, that the methamphetamine was being smoked and used in the house by the parents and using a torch to heat the pipe. That's got to be, you know, I don't know what kind of judgment somebody has using one of those methamphetamine torches at the same time that they're smoking methamphetamine . . . .

. . . And I think that then you have the methamphetamine being manufactured in, and it may well have been manufactured in the outbuilding in the garage, but, you know, that gas doesn't stay in that garage, that gas gets out and floats out on the breezes. And we have that - I can almost take judicial notice, I think I've heard now evidence in hundreds of methamphetamine cases and many cases that involve a situation where people have smelled this stuff from a long way off. And I don't think that's any exception here. And I think it's very likely that the children were able to smell this stuff being manufactured at one time or another, even if they weren't there or even if the manufacturing wasn't going on just at the very time that they happened to be there at the house. It's very powerful stuff. And as one of the children in the other case that we'll be dealing with here in a minute noticed, that stuff is really smelly, I think was the terminology used.

And we have a situation here where Mrs. Bivens when the officers arrived basically was high on the stuff and attacked the officers. And so, you have, you know, I think that that's a substantial risk to the children. This did occur in the morning, but the children were going to be coming home after school. What kind of a risk is there when the children come home and they find that their parents are high or just coming down from a high on methamphetamine. I think that it's a substantial risk.

And I think that for all of those reasons, it is appropriate to award the six levels here for the substantial risk of harm to the children under Section 2D 1.1 (b)(5)(C) of the Federal Sentencing Guidelines.

This doesn't even include the burn pits in the backyard. There is no direct evidence here that the burn pits were actually used to burn waste from the methamphetamine manufacturing process, but I'll bet they were. I think they were. There is no evidence, though of that. And we do know that there was all of that garbage in the back of the truck. So I think for all of those reasons that the six levels should be awarded.

(J.A. 174-77.) The Bivenses concede that the district court was correct in concluding that a large

quantity of chemicals were found, and that methamphetamine production had been ongoing for a

substantial period of time. They challenge, however, the district court's findings regarding the disposal of the chemicals and the proximity of the laboratory to the children. They claim that there was no evidence before the court that the burn pits were used for anything other than burning household garbage. And they argue that the evidence shows that the chemicals were stored, and methamphetamine was manufactured, in the locked garage 50 feet from the house, and that no evidence contradicts their assertions that they never cooked or used methamphetamine while the children were present. They also object to the court's use of an impermissible fifth risk factor, namely the danger posed to the children by the Bivenses' *use* of methamphetamine, as opposed to the manufacture of methamphetamine.

It is true that some of the district court's analysis of the risk factors consists of musing on the use of the burn pits, the inference from the fact that children in a different case testified that they could smell chemicals during methamphetamine production to the conclusion that so too could the Bivenses' children, and concern about the risk posed by the Bivenses' use of methamphetamine, which is not, as the Bivenses, point out, one of the enumerated factors listed in §2D1.1(b)(5)(C). The Guidelines do not require the sentencing court to find that the Bivenses' children were *actually harmed* by the Bivenses' production of methamphetamine, however, only that their lives were placed at substantial *risk* of harm. The district court's inferences, based on the court's familiarity from other cases with the methamphetamine production process, about the likely use of the burn pits to dispose of toxic waste from the manufacturing process, and the likelihood that odors from methamphetamine production in the garage would reach the house fifty yards away are clearly relevant to the court's determination that the children were placed at risk. Relevant also are the

methamphetamine addiction of the Bivenses and the extremely poor judgment they exercised in utilizing a blowtorch to smoke methamphetamine in the house. Central to the Bivenses' argument that they did not place their children at risk is their contention that they took extreme precautions to protect the children from the dangers posed by the manufacturing process. As the district court rightly noted, the credibility of that contention is severely undermined by the irresponsibility demonstrated by the Bivenses in their other drug-related activities. Their claim to have restricted the manufacturing process to the locked barn is also belied by the presence in the house of lab components, such as pill-grinders, scales, and baggies, and of firearms and finished methamphetamine. In short, the evidence before the district court demonstrates that the Bivenses did indeed place their children at substantial risk of harm by manufacturing methamphetamine.

Rhonda Bivens also argues that the very existence of the enhancement for substantial risk of harm to minors is unconstitutional because it (a) constitutes cruel and unusual punishment in violation of the Eight Amendment because it results in disparate treatment of defendants accused of possessing different drugs, and (b) violates the Equal Protection Clause, because it discriminates against parents. Neither claim has merit. In *Layne*, we rejected a similar Eighth Amendment argument that a sentence issued under then §2D1.1(b)(6)(A) violated the Constitution "merely because it is disproportionate to the sentences received by others who committed the same or similar crimes." 324 F.3d at 474. The equal protection argument fails because the sentencing enhancement at issue does not penalize the defendants for being parents; it simply penalizes them for exposing their children to criminal activities. The enhancement is not limited to parents, nor is the risk of harm limited to a defendant's offspring. *See, e.g.*, *United States v. Massey*, 79 Fed. Appx. 832, 837

(6th Cir. 2003) (unpublished) (affirming application of substantial-risk enhancement when methamphetamine was manufactured in a shed attached to a residence that housed a day care center). Although it is probably true as a purely statistical matter that parents manufacturing methamphetamine are more likely than non-parents to have children present, this fact alone does not constitute evidence that parents are unlawfully discriminated against by the challenged enhancement.

**III**

Rhonda Bivens argues that she was only a minor participant in the conspiracy to manufacture methamphetamine, and was therefore entitled to at least a two-level decrease in her offense level pursuant to USSG §3B1.2(b). She claims that no evidence was presented that she aided her husband's manufacture of methamphetamine after December 2002. She claims that the couple were estranged between December 2002 and their arrest in April 2003, but that their straitened circumstances forced them to remain in the same household.

A defendant bears the burden of proving by a preponderance of the evidence she played a mitigating or minor role. *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001). The determination of whether a defendant qualifies for a mitigating-role reduction is "heavily dependent upon the facts of the particular case." USSG §3B1.2, comment. (n.3). As such, the district court's ruling on the issue is reviewed for clear error. *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002). Where more than one person is involved in an offense, §3B1.2(b) provides for a two-level reduction "[i]f the defendant was a minor participant in any criminal activity." A minor participant is one "who is less culpable than most other participants, but whose role could not be

described as minimal." USSG §3B1.2(b), comment. (n.5). A "minimal participant" is someone

"who plays a minimal role in concerted activity," one who is "plainly among the least culpable of

those involved in the conduct of a group." *Id.*, comment. (n.4). "[T]he defendant's lack of

knowledge or understanding of the scope and structure of the enterprise and of the activities of

others is indicative of a role as a minimal participant." *Ibid.*

As described in the commentary to USSG §3B1.2, whether or not a defendant is a "minor

participant" in a conspiracy depends upon factors such as her involvement relative to the other

participants, her knowledge of the scope of the activity, her understanding of the nature of the

jointly-undertaken offense, and her culpability with respect to the conduct that forms the basis of

her particular offense level. "'[T]he salient issue is the role the defendant played in relation to the

activity for which the court held him or her accountable.'" *Campbell*, 279 F.3d at 396 (quoting

*United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001)). In addition, "we have held that

downward departures under §3B1.2 are available only to a party who is 'less culpable than most

other participants' and 'substantially less culpable than the average participant.'" *Ibid.* (quoting

*United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993)). In this case, the district court found that

Rhonda Bivens took an active and regular role in the purchase of raw materials to be used in the

manufacture of methamphetamine. She knew and understood the recipe that she and her husband

used to manufacture methamphetamine, and she computed the necessary chemical amounts in order

to mix the formula correctly. The district court found that she had therefore played a significant role

in the manufacturing enterprise. In addition, the court found that not only had she profited from the

manufacture of the drug through the sales made by her husband and the amounts she consumed for

personal use, her drug habit may even have been the driving force behind the whole operation.

Finally, as the government points out, Rhonda Bivens's claims that the children were never present

during methamphetamine manufacturing imply that she was always aware when her husband was

manufacturing the drug and when he was using it. She even claimed to know which components

found in the garage were attributable to her husband and which belonged to an associate. In short,

the record demonstrates that Rhonda Bivens had extensive knowledge of her husband's

methamphetamine activity, and played a key and necessary role in the production of

methamphetamine at her residence. Considering these facts, the court did not clearly err in denying

Rhonda Bivens a mitigating role reduction.

**IV**

The Bivenses' final claim is that their sentences were unconstitutional in light of *United States v. Booker*. In *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005), we held that remand of a pre-*Booker* sentence is required absent "clear and specific evidence that the district court would not have, in any event, sentenced the defendant to a lower sentence under an advisory Guidelines regime." *See id.* at 529-30. Accordingly, we **VACATE** the sentences of Rhonda Bivens and Gregory Bivens and **REMAND** their cases to the district court for resentencing in light of *Booker*.