*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-5959

RICHARD WHITED,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 04-00021—R. Allan Edgar, District Judge.

Submitted: November 1, 2006

Decided and Filed: January 9, 2007

Before: GILMAN and GRIFFIN, Circuit Judges; GWIN, District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** Robert S. Peters, SWAFFORD, PETERS, PRIEST & HALL, Winchester, Tennessee, for Appellant. Christopher D. Poole, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. A federal grand jury indicted George Bryant, Crystal Keel, Scottie Magouirk, and Richard Whited on ten counts relating to the manufacture and use of methamphetamine. Following a jury trial in Bryant's case and guilty pleas in the cases of Keel, Magouirk, and Whited, the district court imposed sentences of 100, 188, 151, and 151 months in prison, respectively. Whited's sole challenge relates to whether his arrest in a motel room containing both a minor and an operational methamphetamine laboratory, replete with the smell of methamphetamine chemicals, warranted a six-level enhancement for substantial risk of harm to the life of a minor under the United States Sentencing Guidelines (U.S.S.G.) § 2D1.1(b)(6)(C) (2005) (now at § 2D1.1(b)(8)(C) in the 2006 version). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

# I. BACKGROUND

## A.     Procedural background

The grand jury charged Whited in seven counts of the ten-count indictment that also named Keel, Magouirk, and Whited.  In exchange for the government's dismissal of the six other counts, Whited pled guilty to Count One only.  Count One charged him with conspiracy to knowingly manufacture methamphetamine between January of 2001 and April 22, 2004, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.  The Presentence Report (PSR) calculated Whited's advisory Sentencing Guidelines range to be between 168 and 210 months of imprisonment.  This was based on a total offense level of 33, which included a six-level enhancement for substantial risk of harm to the life of a minor pursuant to U.S.S.G. § 2D1.1(b)(6)(C).  In May of 2005, the district court recalculated the range to be between 135 and 168 months based on its disagreement with a separate two-level enhancement recommended by the PSR.  The court agreed, however, with the recommended six-level substantial-risk-of-harm enhancement and sentenced Whited to 151 months in prison.  This timely appeal followed.

## B.     Factual background

Although the PSR recites numerous instances of "offense conduct" in support of Whited's guilty plea and the probation officer's recommended sentence, only one instance is relevant to this appeal.  On October 20, 2003, several police officers arrested Whited and Keel in a room at the Country Inns and Suites motel in Manchester, Tennessee.  The arrests followed a search of the room in which the officers found and seized finished methamphetamine product, marijuana, and an operational methamphetamine laboratory.  Also in the room was a 17-year-old female named Jessica Gipson, whom the officers arrested as well.  Finally, the officers reported smelling chemicals—a "telltale chemical meth smell"—during their search.

# II. ANALYSIS

## A.     Standard of review

We review de novo a district court's "finding on a mixed question of law and fact—such as the existence of a substantial risk of harm to human life under U.S.S.G. § 2D1.1(b)(5)(B)." *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005).  The governing legal standard for substantial-risk-of-harm enhancements, both at sentencing and on appeal, requires a balancing of four factors: (1) the quantity of hazardous materials and the manner in which they were stored, (2) the manner of disposal of the hazardous materials and the likelihood of their release into the environment, (3) the duration of the offense and extent of the manufacturing operation, and (4) the location of the laboratory (i.e., in a residential or remote area) and the number of lives placed at substantial risk of harm.  *See id.* at 313 (citing U.S.S.G. § 2D1.1 cmt. 20).  Section 2D1.1 defines a minor as one who has not yet reached the age of eighteen.  U.S.S.G. § 2D1.1 cmt. 20 (adopting the definition of a minor contained in § 2A3.1 cmt. 1).

Although the presence of a minor brings this case within U.S.S.G. § 2D1.1(b)(6)(C) as opposed to § 2D1.1(b)(6)(B) (the general provision regarding harm to human life at issue in *Davidson*), we see no reason why the same analysis should not apply.  Comment 20 to § 2D1.1—titled "Substantial Risk of Harm Associated with the Manufacture of Amphetamine and Methamphetamine"—draws no distinction between the two provisions.  If anything, the language of § 2D1.1(b)(6)(C)—addressing "a substantial risk of harm to the life of a minor or an incompetent"—strongly suggests that the required showing for the six-level enhancement should be no more exacting than that required for the three-level enhancement under § 2D1.1(b)(6)(B), which addresses "human life" more generically.

**B.     Discussion**

Two sections of Whited's plea agreement are especially relevant to the disposition of his appeal. The first is paragraph 12, which provides in pertinent part:

> Defendant acknowledges that his sentence will be determined within the discretion of the Court, as constrained by law. Defendant acknowledges that the Federal Sentencing Guidelines will be considered in defendant's case to determine the appropriate sentence.

Whited, accordingly, can not and does not question the applicability of U.S.S.G. § 2D1.1(b)(6)(C) to his case.

The other significant provision is subparagraph 18(b), which provides in pertinent part:

> On or about October 20, 2003, defendant Whited, Keel and a juvenile were arrested in a Manchester motel room at the Country Inns and Suites motel. There was a methamphetamine laboratory, finished methamphetamine, and a loaded handgun, a Czeh 7.65 semi-auto pistol, in the room.

Whited did not dispute these facts at his sentencing hearing and does not dispute them on appeal. His objection at sentencing to the six-level enhancement instead related to his subjective knowledge of the minor's actual age. As his counsel expressed in writing following her review of the PSR, "Mr. Whited denies knowing the true age of the 17-year-old who was with Crystal Keel. He thought she was Crystal's age and therefore he objects to this 6 level enhancement."

This narrow objection necessarily implies that if Whited had known the true age of the 17-year-old minor in his motel room, he would not be contesting the six-level enhancement. As in other related contexts, however, the Guidelines do not require Whited's actual knowledge of the minor's age in order to apply the enhancement, and this court has held that "[s]entencing guidelines should be read as they are written." *United States v. Cobb*, 250 F.3d 346, 349 (6th Cir. 2001); *cf. United States v. Scott*, No. 92-6435, 1993 WL 280323, at *6 (6th Cir. July 26, 1993) ("Knowledge that a girl is under 18 years of age when transported interstate is not part of the proof required of the government in order to sustain a conviction under 18 U.S.C. § 2423 . . . ."). Because Whited's subjective knowledge of Gipson's age is legally immaterial, and because Whited did not otherwise dispute the facts of his arrest, we conclude that the district court properly denied Whited's objection at the sentencing hearing to the proposed six-level substantial-risk-of-harm enhancement.

Whited raises a slightly different argument on appeal, claiming that the analysis and the result in *Davidson* compel a favorable result in his case. This argument is probably sufficiently distinct from his prior mistake-of-fact claim so as to limit him to plain-error review. We need not resolve the point, however, because Whited cannot prevail under even the more favorable de novo standard. The relevant facts in *Davidson* were that the Davidsons maintained "a methamphetamine lab located in a locked barn loft in a remote location." 409 F.3d at 314. Although acknowledging that "all methamphetamine production operations pose some risk" to human life, the *Davidson* court went on to conclude that the Davidsons' particular operation did not pose a substantial risk because it took place in "one of the (relatively) safer places a person could set up an illegal methamphetamine lab." *Id.* The court reached that conclusion by way of a brief comparison with the facts and holding in *United States v. Layne*, 324 F.3d 464 (6th Cir. 2003), where this court upheld a substantial-risk-of-harm enhancement. The relevant facts in *Layne*, as summarized by the court, were these:

> The laboratory was in Dick's apartment, which itself is in a large apartment complex in a densely settled area near a number of other apartment complexes. Dick's

apartment is within an eight-unit structure. At the time the search warrant was executed—while Defendants manufactured methamphetamine—the other seven units were occupied. An elementary school is housed nearby, and a creek flows through the apartment complex and empties into the Tennessee River.

*Id.* at 471.

Regarding the substantiality of the risk created by Whited's methamphetamine-production operation, the risk here is far greater than in *Davidson* and arguably even greater than in *Layne*. Whited, his methamphetamine laboratory, and a 17-year-old girl were all in the same room when and where the arrest took place at the Country Inns and Suites motel. According to travel web sites, the motel is an 81-unit complex. To be sure, nothing in the record indicates the manner of disposal (the second Guidelines' factor) of the hazardous materials in Whited's motel room, so we must therefore treat that factor as "indeterminate." *See Davidson*, 409 F.3d at 314 (holding that "in the absence of any evidence suggesting that hazardous materials were actually disposed of in an improper manner, it is not appropriate for the district court to speculate that they would be"). The other relevant factors, however, militate in favor of the six-level enhancement for substantial risk of harm to the life of a minor pursuant to § 2D1.1(b)(6)(C).

### Factor 1: *Quantity and manner of storage of hazardous materials*

Although Whited is generally correct in noting that "definite" factual findings as to the four Guidelines' factors are "absent in this case," certain relevant facts are undisputed. One such fact is that Whited's motel room contained "a smell of chemicals, [a] telltale chemical meth smell." As *Layne* teaches, many of the chemicals involved in the production of methamphetamine are "toxic," "inherently dangerous," "highly flammable," and "pose a serious risk to those who inhale them." *Layne*, 324 F.3d at 470. The officers who searched the room also discovered both finished methamphetamine product in the amount of 1.23 grams and an operational methamphetamine laboratory. Although 1.23 grams is a minimal amount, and certainly far less than the "couple of ounces" at issue in *Layne*, "the inherent dangers of methamphetamine manufacturing," which § 2D1.1 "was designed to address," militates in favor of applying § 2D1.1(b)(6)(C). *See Layne*, 324 F.3d at 470-71.

### Factor 3: *Duration of the offense and extent of the manufacturing operation*

Count One of the indictment, to which Whited pled guilty, describes a period of methamphetamine manufacturing lasting more than three years, from January of 2001 to April of 2004. The arrest of Whited in his motel room occurred on October 20, 2003, well within this time frame. Although we acknowledge that the record does not indicate for how long Whited had been staying in the motel room or for how long he had been maintaining the methamphetamine laboratory found inside, the fact that there was an actual operational laboratory in the room, as opposed to simply finished methamphetamine product, suggests more than an insignificant passage of time. "Thus, like the first factor, this factor does not suggest that the laboratory at issue was extraordinary, but nevertheless militates in favor of application of [§ 2D1.1(b)(6)(C)], which was designed to address the inherent dangers of methamphetamine manufacturing." *Layne*, 324 F.3d at 470-71.

### Factor 4: *Location of the laboratory and the number of lives placed at substantial risk of harm*

Whited's methamphetamine laboratory was in a densely populated area. As noted, the motel room where Whited operated the laboratory was one of 81 units—more than 10 times the number of units in *Layne*. Whited, Keel, and Gipson were all in the room at the time of the arrest. Although the record does not reveal how many of the other 80 rooms in the motel were also occupied, "the laboratory here clearly posed an inhalation risk not only to Defendants and [Gipson], but also to

others." *See Layne*, 324 F.3d at 471.  The officers' experience in smelling the chemicals in the room lends ample support to this conclusion.

Even if all 80 of the other rooms in the two-floor motel had been empty at the time (a highly unlikely possibility), the undisputed fact that a minor was physically present in Whited's room would remain.  The wording and legislative history of § 2D1.1(b)(6)(C) suggest that this fact alone—a single minor—would warrant the six-level enhancement under the circumstances of this case.  Unlike § 2D1.1(b)(6)(B), which addresses "a substantial risk of harm to [] human life other than a life described in subdivision (C)," § 2D1.1(b)(6)(C) addresses "a substantial risk of harm to the life of *a* minor or *an* incompetent."  (Emphasis added.)  The added singular articles "a" and "an" might appear to represent only a technical inconsistency with subdivision (B), but the legislative history of § 2D1.1 confirms their special significance.  In passing the Methamphetamine and Club Drug Anti-Proliferation Act of 2000, from which § 2D1.1 derives, the U.S. House of Representatives drew attention to methamphetamine's potential to harm human life, and "more disturbing," the lives of children:

> The methamphetamine epidemic in America differs in kind from the threat of other illegal drugs because methamphetamine can be made from readily available and legal chemicals and substances, and because it poses serious dangers to both human life and to the environment.  Additionally, these chemicals and substances are utilized in a manufacturing process that is unstable, volatile, and highly combustible.  Even small amounts of these chemicals, when mixed improperly, can cause explosions and fires.  For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks, or sewage systems in an effort to conceal evidence of illegal manufacturing. *More disturbing is that most of these laboratories are situated in residences, motels, trailers, and vans, and often times are operated in the presence of children.*

Methamphetamine and Club Drug Anti-Proliferation Act of 2000, H.R. Rep. No. 106-878, at 22 (2000) (emphasis added).

To be sure, the *Davidson* court did note that "[n]either the language of [§ 2D1.1(b)] nor its commentary suggests that the Substantial-Risk-of-Harm Enhancement should be applied any time methamphetamine is manufactured in anything less than professional laboratory conditions."  409 F.3d at 314.  This, however, is one of those times.  The actual presence of a minor in the motel room containing a functioning methamphetamine laboratory, when considered in conjunction with the various Guidelines factors discussed above, supports the six-level substantial-risk-of-harm enhancement imposed by the district court.  We readily acknowledge that the presence of a minor in a room with a methamphetamine laboratory and/or finished methamphetamine product is not in and of itself sufficient to trigger the § 2D1.1(b)(6)(C) enhancement.  In the present case, however, the fact that the motel room also contained "a telltale chemical meth smell" indicates that the risk to Gipson was indeed both real and substantial.  In short, although the district court made few factual findings in support of its decision to impose the six-level enhancement, the findings that the court did make—and that Whited does not dispute—were sufficient to warrant imposition of the enhancement under the Guidelines.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.