UNITED STATES of America,
Plaintiff–Appellee,

v.

Susan HOUCHINS, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Kenneth Wayne Haley, Defendant–
Appellant.

Nos. 03–4536, 03–4537.

United States Court of Appeals,
Fourth Circuit.

Argued: Feb. 25, 2004.

Decided: April 14, 2004.

**ARGUED:** David Robert Bungard, Assistant Federal Public Defender, Charleston, West Virginia, for Appellants. Stephanie Lynn Ojeda, Assistant United States Attorney, Charleston, West Virginia, for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, Jonathan D. Byrne, Legal Research and Writing Specialist, Office of the Federal Public Defender, Charleston, West Virginia, for Appellant Haley. Sante Boninsegna, Jr., Princeton, West Virginia, for Appellant Houchins. Kasey Warner, United States Attorney, Charleston, West Virginia, for Appellee.

Before MOTZ, KING, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge KING wrote the opinion, in which Judge DIANA GRIBBON MOTZ and Judge GREGORY joined.

## OPINION

KING, Circuit Judge:

Susan Houchins and Kenneth Wayne Haley were convicted in the Southern District of West Virginia of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. § 846. Houchins and Haley appeal their sentences of seventy months and eighty-seven months, respectively; contending that the district court erroneously found their actions to have created a substantial risk of harm to human life and the environment, and that it thereby improperly enhanced their Guidelines offense levels. Haley also appeals the court's refusal to seal his presentence

report ("PSR") from disclosure to Congress. *United States v. Houchins*, No. 5:02–00248–04 (S.D.W.Va. June 19, 2003) (the "Houchins Memorandum"); *United States v. Haley*, No. 5:02–00248–01 (S.D.W.Va. June 19, 2003) (the "Haley Memorandum"). As explained below, we affirm.

## I.

### A.

On September 13, 2002, Rennis Ward of Ansted, West Virginia, advised law enforcement authorities that, on September 6 and 7, 2002, he had observed two men manufacturing drugs in his neighbor's yard. Although Ward was unsure of the drug being manufactured, he described the process he had observed. Ward advised Detective Garland Burke of the Fayette County Sheriff's Office that the two men, later identified as Kenneth Haley and Roby Dolinger, Jr., had combined the contents of several containers into a gallon-sized storage bag into which they had inserted a piece of hose.[1] J.A. 125. After the containers were emptied into the bag, one of the men shook the bag while the other blew through the hose. In this process, a "cloud of white smoke" was ex-

pelled from the bag and drifted around the yard next to the Ward home "for some time." J.A. 125. Haley and Dolinger then retrieved some small "white-looking rocks" from the bag and carried them into the home of Ward's neighbor, defendant Susan Houchins.[2] J.A. 125. Ward stated that the men thereafter cleaned the containers, placed them in a black bag, and carried the bag into the Houchins home. Finally, Ward said that two women, later identified as Houchins and Katie Dolinger, frequently came out of the house during the process to speak with Haley and Roby Dolinger, Jr.[3]

Approximately two weeks later, on September 25, 2002, a confidential informant (the "CI") contacted Burke and advised him about a recent telephone call from Haley. J.A. 126. According to the CI, Haley was manufacturing methamphetamine and had offered to sell the CI an ounce of the drug for $1,000. The CI and Haley agreed to meet the next day so that the CI could purchase methamphetamine. At that meeting, however, Haley advised the CI that he had been unable to make any "meth," explaining that he needed to secure anhydrous ammonia from his source in Ohio in order to manufacture the substance.[4] Haley promised that he would

---

1. Ward provided Burke a description of the men and the vehicles they drove, as well as each vehicle's license number. J.A. 126. Police officers verified that one of the vehicles was registered to Haley's parents and that the other was registered to Roby Dolinger, Jr. J.A. 126.

2. Evidence provided at the sentencing hearing by EPA agent Nick Gillespie indicated that other residences "were sitting fairly close together" around the Houchins home, and that the Houchins home was located only ten to twenty yards from neighboring homes. J.A. 56.

3. Based on the information provided by Ward, Burke believed that methamphetamine,

a Schedule II controlled substance, was being illegally manufactured, and he obtained a search warrant for the Houchins residence. Due to the ongoing nature of the investigation, however, the warrant was not executed. J.A. 126.

4. The defendants used the "anhydrous ammonia method" in their production of methamphetamine. Although anhydrous ammonia is not an ingredient in methamphetamine, its use in the manufacturing process greatly reduces the time required to produce the drug. "Anhydrous" means "free from water," and "[w]hen liquid anhydrous ammonia comes in contact with skin or eyes or when the vapor is inhaled, it can severely burn and damage tissues. In sufficient quantities and concen-

obtain the ammonia and that he would recontact the CI when methamphetamine was available.[5] J.A. 126.

Less than two weeks later, on October 4, 2002, the CI contacted Burke and informed him that he had again heard from Haley, who claimed that he had manufactured methamphetamine and was willing to sell it. The following morning, Burke contacted Ward and asked if he had observed any suspicious activity at the Houchins home. Ward reported that Haley's car had returned to the Houchins home the previous day, and that Ward had observed the black bag—used earlier as a storage container by Haley and Roby Dolinger, Jr.—being hidden in the crawlspace under the Houchins home. J.A. 127.

Later that morning, the CI met with Haley and Roby Dolinger, Jr. in Beckley, West Virginia, where Haley and Dolinger were arrested. A single dose of methamphetamine, containing 0.031 grams, was found in Haley's car. Following his arrest, Haley admitted that he had produced methamphetamine at the home of Rickie Wilson, on nearby Turkey Creek, the previous day. Haley also explained that he had procured anhydrous ammonia in Chillicothe, Ohio, for the "cooking" of methamphetamine. Finally, Haley explained that he had stored some of the equipment used to manufacture methamphetamine at the Houchins home.

In the early afternoon of October 5, 2002, the authorities executed a search warrant at the Wilson home, and they seized a bucket containing a white frothy substance and a container used to transport anhydrous ammonia. They also discovered that a small area of the yard, covered by a tarpaulin, was emitting a strong chemical smell. According to the officers who executed the warrant, the smell was so strong that it burned their noses and caused one officer to suffer a severe headache. Soil samples were collected from locations in the Wilson yard where the officers suspected methamphetamine had been manufactured. Later that same afternoon, Wilson advised the officers that Haley and Katie Dolinger had manufactured methamphetamine at his residence on the previous day. He also stated that he had visited in the Houchins home on two other occasions when methamphetamine was being manufactured.

Later that day, the authorities executed a search warrant at the Houchins home in Ansted. In the crawlspace under the house, officers found a black canvas bag containing various implements commonly used in the manufacture of methamphetamine. Finally, a soil sample was collected from the area of Houchins's yard where Ward had observed suspicious activity.

### B.

On December 23, 2002, Houchins and Haley pleaded guilty to conspiracy to manufacture a quantity of methamphetamine, in violation of 21 U.S.C. § 846. At their sentencing hearing on June 16, 2003, the probation officer recommended a three-level enhancement, under § 2D1.1(b)(5)(B) of the Sentencing Guidelines, to reflect the substantial risk of harm to which the community had been subjected by Houchins and Haley's criminal activities. In the PSRs, the probation officer observed that the conspirators had manufactured a quantity of methamphetamine outside of resi-

---

trations, it can cause death." *United States v. Smith*, 210 F.3d 760, 761 (7th Cir.2000).

**5.** On October 5, 2002, police officers recorded a conversation between Haley and the CI, during which Haley said that Houchins had previously driven him to Ohio to obtain anhydrous ammonia. J.A. 159.

dences in Fayette County, West Virginia, on at least three occasions; that two of their methamphetamine productions were conducted in a residential area within ten to twenty yards of neighboring homes; that the process had exposed others in the community to the possibility of explosions by volatile substances such as anhydrous ammonia; that EPA tests on soil samples from the Houchins and Wilson yards indicated that hazardous or toxic substances had been discharged into the environment during the production of methamphetamine; that the production area at the Wilson home emitted a chemical odor so strong that it burned the officers' noses and caused an officer to suffer a severe headache; and that Haley had transported anhydrous ammonia in an unapproved container from Chillicothe, Ohio, to Ansted.

At sentencing, Haley requested the court to seal his PSR so that, unless requested with particularity, it would be unavailable under the Feeney Amendment for congressional review.[6] Haley maintained that the right of Congress, pursuant to the Feeney Amendment, to access his PSR without identifying the items sought, contravenes his Fourth Amendment rights.

In sentencing Houchins and Haley, the court found that they had subjected their community to a substantial risk of harm through the unsafe manufacture of methamphetamine, and it concluded that their offense levels should be enhanced by three levels pursuant to Guidelines § 2D1.1(b)(5)(B). Houchins was sentenced to seventy months in prison, followed by

three years of supervised release, and Haley was sentenced to eighty-seven months of imprisonment, followed by three years of supervised release. *United States v. Houchins*, No. 5:02–00248–04 (S.D. W. Va. June 16, 2003) (Judgment Order); *United States v. Haley*, No. 5:02–00248–01 (S.D. W. Va. June 16, 2003) (Judgment Order).

On June 19, 2003, in the Houchins Memorandum and the Haley Memorandum, the court memorialized its rulings of June 16, 2003. In so doing, the court stated that it had received and reviewed Houchins's and Haley's PSRs and that it "adopted the statements contained therein as its findings of fact and conclusions of law." Houchins Memorandum at 4; Haley Memorandum at 5. The court overruled Houchin's and Haley's objections to its application of the sentence enhancement because it "FOUND and CONCLUDED that [Houchins and Haley's] manufacture of methamphetamine created a danger of substantial harm to human life and, at least temporarily, substantial harm to the environment." Houchins Memorandum at 4; Haley Memorandum at 4. The court also addressed Haley's request that his PSR be sealed so that Congress would be unable to obtain it through the generalized request authorized by the Feeney Amendment. The court observed that the extent to which Haley's right to privacy might be infringed by Congress's use of the Feeney Amendment has not been determined. Because Congress has not yet relied on the Feeney Amendment to secure and review PSRs, and it is uncertain whether

---

**6.** Prior to the 2003 enactment of the Feeney Amendment, 28 U.S.C. § 994(w) required the Sentencing Commission to periodically provide general sentencing reports to Congress. The Feeney Amendment, enacted pursuant to the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (i.e., the "PROTECT Act"), modified, inter alia, the reporting provisions of

§ 994(w). *See* 149 Cong. Rec. S6708–01 (May 20, 2003). Pursuant thereto, the Chief Judge of each district is obliged to submit presentence reports to the Sentencing Commission and, upon request, the Commission is to forward those reports to the House and Senate Committees on the Judiciary. 28 U.S.C.A. § 994(w) (West Supp.2003).

Congress will rely on the Amendment to request his PSR, Haley cannot show that the Feeney Amendment has infringed upon his constitutional rights, or that such an infringement is imminent. The court concluded, therefore, that Haley lacked standing to challenge the constitutionality of the Feeney Amendment. Haley Memorandum at 8. Houchins and Haley have timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

 When reviewing a district court's application of the Guidelines in the context of an enhancement, we review the court's findings of fact for clear error. *United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir.1989). Whether a district court has properly found the existence of a substantial risk of harm to human life or the environment within the meaning of Guidelines § 2D1.1(b)(5)(B) is a mixed question of law and fact which we review de novo. *United States v. Layne,* 324 F.3d 464, 468 (6th Cir.2003). We also review de novo whether Haley possessed Article III standing to challenge the Feeney Amendment. *See Marshall v. Meadows,* 105 F.3d 904, 905–06 (4th Cir.1997).

## III.

### A.

On appeal, Houchins and Haley assert that the district court erroneously enhanced their sentences pursuant to Guidelines § 2D1.1(b)(5)(B) (the "Risk Enhance-

ment").[7] The Risk Enhancement is only applicable when the offense of conviction satisfies two criteria, that is, it "(i) involved the manufacture of ... methamphetamine; and (ii) created a substantial risk of harm to (I) human life ...; or (II) the environment...." Houchins and Haley maintain that, because they were not operating an "active" methamphetamine laboratory, no precursor chemicals were found at their production sites, and no quantifiable amounts of toxic or hazardous substances were disposed of into the environment surrounding those sites, the court's application of the Risk Enhancement to their offense levels was improper.

In pleading guilty to the offense of conspiracy to manufacture methamphetamine, Houchins and Haley conceded that their conspiracy offense satisfies the first prong of the Risk Enhancement—it involved the manufacture of methamphetamine. They contend, however, that the second prong of the Risk Enhancement is not met. Specifically, they assert that the court erred in applying the Risk Enhancement because it erroneously "found and concluded" that their offense "created a danger of substantial harm to human life and, at least temporarily, substantial harm to the environment." Houchins Memorandum at 4; Haley Memorandum at 4.

Application Note 20 of § 2D1.1 (the "Application Note") identifies four factors a sentencing court is to assess in determining whether an offense created a substantial risk of harm to human life or the environment (the "Factors").[8] The Fac-

---

7. If the Risk Enhancement is applicable, a sentencing court must apply a three-level enhancement to the defendant's offense level. Guidelines § 2D1.1(b)(5)(B). If the resulting offense level is less than twenty-seven, the court must increase the offense level to twenty-seven. *Id.*

8. Pursuant to Application Note 20, a sentencing court must include consideration of the following factors in assessing whether an offense created a substantial risk of harm to human life or the environment:

 (i) The quantity of any chemicals or hazardous or toxic substances found at the

tors are designed to assist a sentencing court in determining whether there has been a "substantial risk of harm," as that term is used in the Guidelines. *See* U.S. Sentencing Guidelines Manual app. C (vol. II) at 193–94. As explained below, the sentencing court properly assessed the Factors, and it did not err in determining that the Risk Enhancement was warranted under each.[9]

### 1.

■ The first Factor of the Application Note (the "Storage Factor") mandates that a sentencing court consider "[t]he quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored." Houchins and Haley maintain that, because there were no chemicals found at the Houchins or Wilson homes when the search warrants were executed, the court erred in deciding that the Risk Enhancement was applicable to them under the Storage Factor. We disagree. Pursuant to the Storage Factor, a sentencing court must assess the manner in which the chemicals used in the manufacturing process were stored. The court found that Haley had transported anhydrous ammonia from Ohio to West Virginia "in containers not designed or suitable for the pur-

pose of transporting such material," and that the ammonia was then used by the conspirators in the manufacture of methamphetamine. J.A. 81. Although no hazardous substances were found at either of the production sites (i.e., the Houchins or Wilson homes) when the search warrants were executed, the court correctly determined that the interstate transportation of anhydrous ammonia in non-suitable containers supported application of the Risk Enhancement.

### 2.

■ The second Factor of the Application Note (the "Release Factor") requires that the sentencing court consider "the manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances." In assessing the Release Factor, the court found that the manufacturing and cleanup process employed by Houchins and Haley was "very informal" and that it was "sloppily done." J.A. 81–82. The court observed that Ward watched as a white cloud from the manufacturing process drifted over the yard next to his home. J.A. 81. And EPA agent Gillespie stated that there was an area of "white crystalized material" and dead vegetation in the Houchins yard,

---

laboratory, and the manner in which the chemicals or substances were stored.

(ii) The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

(iii) The duration of the offense, and the extent of the manufacturing operation.

(iv) The location of the laboratory (*e.g.*, whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

Although the earlier version of Application Note 20 provided that a court "may" consider the Factors in determining the applicability of the Risk Enhancement, the Note was amend-

ed on November 1, 2001, and it now mandates that the Factors "shall" be considered. *See* U.S. Sentencing Guidelines Manual app. C (vol.II) at 193–94.

9. We address each of the Factors because the sentencing court concluded that all four Factors were applicable. In addressing each Factor, we do not imply that a sentencing court must find each Factor satisfied in order to apply the Risk Enhancement. What the court must do, in order to pass muster on appellate review, is not clearly err in its finding that the production of methamphetamine created a substantial risk of harm to human life or the environment.

resulting from the improper disposal of byproducts from methamphetamine production. According to the officers who executed the Wilson search warrant, the chemical smell emanating from the area covered by the tarpaulin in the Wilson yard was so strong that it burned their noses and caused an officer to suffer a severe headache. Finally, EPA tests on soil samples taken from the Houchins and Wilson yards revealed that hazardous or toxic substances were discharged into the environment during the production of methamphetamine. In view of this evidence, we are unable to conclude that the court clearly erred in finding that hazardous materials had been released in an environmentally unsafe manner. In these circumstances, the Release Factor supported application of the Risk Enhancement.

### 3.

■ The third Factor of the Application Note (the "Extent Factor") compels a sentencing court to consider "the duration of the offense, and the extent of the manufacturing operation". In this regard, Houchins and Haley do not dispute that they were involved in the manufacture of methamphetamine on three occasions between September 5 and October 5, 2002. The duration of their activities therefore supports a duration-based enhancement. *See Layne*, 324 F.3d at 470 (observing that two-week operation of methamphetamine lab supports duration-based enhancement under Extent Factor). The circumstances surrounding the manufacture of methamphetamine by the defendants bolstered the court's determination that the Extent Factor supported application of the Risk Enhancement. Houchins and Haley procured

anhydrous ammonia, a key ingredient in the production of methamphetamine, in Ohio, and they transported it to West Virginia. The manufacturing process, therefore, spanned approximately 170 miles and two states. In view thereof, the court correctly determined that Houchins and Haley's involvement in the production of methamphetamine supported application of the Risk Enhancement.

### 4.

The final Factor of the Application Note (the "Location Factor") mandates a sentencing court to consider "the location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm." It is undisputed that the Houchins home and the Wilson home were located in residential areas, and Houchins and Haley concede that the Risk Enhancement was supported by the Location Factor.[10]

### B.

In addition to attacking the court's analysis of the Factors, Houchins and Haley challenge the applicability of the Risk Enhancement on the basis of timing, maintaining that the "substantial risk of harm" requirement contains a temporal element overlooked by the sentencing court. Specifically, Houchins and Haley maintain that the Risk Enhancement is justified only under circumstances in which the Government can show that, at the time of a defendant's arrest, there was: (1) a present danger to persons and the environment caused by an active and ongoing involvement in the production of methamphetamine, or (2) that the defendant was in

---

10. Because of the explosive nature and dangerous properties of anhydrous ammonia, the method of methamphetamine production employed by Houchins and Haley is one of the most hazardous methods of producing methamphetamine. J.A. 178.

possession of quantifiable amounts of hazardous or toxic precursor chemicals. Houchins and Haley contend that, because they were not actively producing methamphetamine and did not possess quantifiable amounts of dangerous precursor chemicals when the search warrants were executed, there was no clear and present danger to the community, and the Risk Enhancement was inapplicable. Reviewing this issue de novo, we agree with the district court that the term "significant risk of harm" need not be construed so narrowly. J.A. 80.

■ There is nothing in Guidelines § 2D1.1(b)(5)(B) that creates or justifies a temporal requirement for the Risk Enhancement. And implying a temporal requirement in the Enhancement would, in certain circumstances, produce absurd results. The plain language of the Enhancement requires a sentencing court to enhance the offense level of a defendant convicted of the manufacture of methamphetamine if the offense "created a substantial risk of harm to ... the environment." If it contained a temporal requirement, the Risk Enhancement would be inapplicable regardless of how severely the environment might have been damaged by the manufacture of methamphetamine, so long as the environmental degradation had been remediated by the time of the defendant's arrest. Because there is no temporal requirement in the Guidelines, and because implying such an element would occasionally produce an absurd result, we agree with the district court. Accordingly, the court properly applied the Risk Enhancement in its sentencing of Houchins and Haley.

### C.

We next turn to Haley's contention that the sentencing court erred in declining to seal his PSR from disclosure to Congress. Haley asserts that the court was required to seal his PSR from congressional review because the Feeney Amendment, in authorizing Congress to obtain his PSR through a generalized request, violates his Fourth Amendment right to privacy. As explained below, we agree with the district court.

■ Haley contends that his PSR should not be provided to Congress absent a particularized request for information contained therein. Haley premised this contention on the Southern District of West Virginia's Local Rule of Criminal Procedure 3.01, which provides that "no confidential records of the court ..., including presentence ... records, shall be producible except by written petition to the court particularizing the need for specific information." Prior to enactment of the Feeney Amendment, § 994(w) of Title 28 required the Sentencing Commission to periodically provide general sentencing reports to Congress, and individual PSRs were not included in these reports. The Feeney Amendment, enacted pursuant to the PROTECT Act, modified the reporting provisions of § 994(w). *See* 149 Cong. Rec. S6708–01 (May 20, 2003). Under the amended § 994(w), the Chief Judge in each district must submit to the Sentencing Commission "a written report of the sentence, the offense for which it is imposed, the age, race, sex of the offender, and information regarding factors made relevant by the guidelines. The report shall also include ... *the pre-sentence report....*" 28 U.S.C.A. § 994(w)(1) (West Supp.2003) (emphasis added). Furthermore, § 994(w)(2) provides that "[t]he Commission shall, *upon request,* make available to the House and Senate Committees on the Judiciary, the written reports *and all underlying records accompanying those reports described in this*

*section....* *Id.* § 994(w)(2) (West Supp. 2003) (emphases added). Haley maintains that his Fourth Amendment rights would be contravened by disclosure of his PSR to Congress, and he contends that the Feeney Amendment is rendered unconstitutional by providing for such disclosure. The court, in refusing to seal Haley's PSR from review under § 994(w), concluded that to rule on the constitutionality of the Feeney Amendment would be improper because "the lack of confidentiality [resulting from the Feeney Amendment] is something yet to be determined." J.A. 93.

■ Pursuant to Article III of the Constitution, a claimant must possess standing in order to pursue a federal claim, in that the "federal courts are restricted to the adjudication of 'cases' and 'controversies.'" *See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Maryland,* 268 F.3d 255, 262 (4th Cir.2001). The Article III standing inquiry assures "that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). To possess Article III standing, (1) an individual must have suffered an "injury in fact," (2) the injury must be "fairly traceable to the challenged action of the defendant," and (3) it must be likely that the injury will be redressed by a favorable decision. *S. Blasting Servs., Inc. v. Wilkes County,* 288 F.3d 584, 595 (4th Cir.2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Because Haley cannot meet the initial requirement of standing—that is, he cannot establish that he

has suffered an injury in fact—the dismissal of his claim must be sustained.

■ An injury in fact is shown when an individual suffers "'an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent.'" *Piney Run Pres. Ass'n,* 268 F.3d at 263 (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 154 (4th Cir.2000)). Put simply, Haley's claim of injury is conjectural and hypothetical, in that he has failed to show that any privacy interest in his PSR has been invaded or that such an invasion is imminent. The district court was not provided with any evidence, and we are aware of none, indicating that the Commission has submitted Haley's PSR to Congress. Furthermore, there is no indication in the record, or in Haley's submissions to this court, that a Committee on the Judiciary has requested, or plans to request, Haley's PSR for review. The court therefore correctly concluded that Haley lacks standing to challenge the constitutionality of the reporting provisions of the Feeney Amendment. *See Friends for Ferrell Parkway, LLC v. Stasko,* 282 F.3d 315, 322 (4th Cir.2002) (observing that injury-in-fact requirement is not satisfied if injury is conjectural or hypothetical).

## IV.

Pursuant to the foregoing, we affirm the application of the Risk Enhancement in the sentencing of Houchins and Haley, and we affirm the dismissal of Haley's challenge to the Feeney Amendment.

*AFFIRMED*