# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1466

_____

United States of America,     *
                        *

     Plaintiff - Appellee,     *
                        *   Appeal from the United States

v.                       *   District Court for the
                        *   Southern District of Iowa.

David Richard Pinnow,     *
                        *

     Defendant - Appellant.     *

_____

Submitted: September 25, 2006
Filed: December 1, 2006

_____

Before LOKEN, Chief Judge, BEAM and GRUENDER, Circuit Judges.

_____

LOKEN, Chief Judge.

In January 2004, Coralville, Iowa, police arrested David Pinnow after he loaded chemicals and equipment used to manufacture methamphetamine into a taxi outside his hotel. Police found additional precursor chemicals and equipment in his hotel room and in a car he had rented. Pinnow pleaded guilty to attempting to manufacture methamphetamine. His presentence investigation report (PSR) recommended a three-level enhancement because the offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life or to the environment. <u>See</u>

U.S.S.G. § 2D1.1(b)(8)(B).[1] The district court[2] overruled Pinnow's objection to the enhancement and sentenced him to 175 months in prison, seven months above the bottom of his advisory guidelines sentencing range of 168 to 210 months. Pinnow appeals, challenging the enhancement and the reasonableness of his sentence. We affirm.

**I.**

Paragraphs 5-15 of Pinnow's PSR set forth a detailed summary of his offense conduct. Paragraph 27 recommended the § 2D1.1(b)(8)(B) enhancement. Pinnow objected to one sentence in paragraph 9 that is not material to this appeal. He also objected to the drug quantity calculation, an objection that was resolved at sentencing when the parties stipulated to a base offense level of 30. And he objected to the enhancement recommended in paragraph 27. The following fact summary is taken from portions of paragraphs 5-15 to which Pinnow did not object.

After Coralville police officers detected a strong odor of ether emanating from a rental car parked at a local hotel and a police dog alerted to the presence of drugs in the car, the police obtained a warrant and towed the vehicle. A subsequent search uncovered burnt aluminum foil containing an unknown residue; a plastic pitcher containing an unknown brown substance; an empty bottle of isopropyl alcohol; starter fluid; a five gallon bucket with lid and plastic tubing; multiple valves, plugs, and clamps; and receipts for the purchases of chemicals used in the manufacture of methamphetamine. Hotel records associated the rental car with room 163. The

---

[1]After its adoption effective December 16, 2003, this provision was moved from § 2D1.1(b)(6)(A) to § 2D1.1(b)(5)(B) to § 2D1.1(b)(6)(B) to its present location. There has been no substantive change since Pinnow's offense of conviction. See U.S.S.G. App. C, amendments 608, 620, 667, 681.

[2]The HONORABLE ROBERT W. PRATT, Chief Judge of the United States District Court for the Southern District of Iowa.

officers learned that Pinnow was staying in room 163 and had recently stayed at other hotels in the Coralville area.

When police saw Pinnow put several packages in the trunk of a taxi and hurriedly leave the hotel, they arrested him on outstanding warrants. A search of Pinnow and his belongings yielded acetone, sulfuric acid, a gas mask, lithium batteries, burnt aluminum foil, coffee filters, glass and plastic containers and tubing, a digital scale, and a seven-gallon metal tank wrapped in plastic bags. Most significantly, police found fourteen boxes of various over-the-counter cold medications containing enough pseudoephedrine to manufacture 18.36 grams of actual (pure) methamphetamine, and a white powder which, when tested, proved to be enough crushed pseudoephedrine to manufacture 32.38 grams of actual methamphetamine. A warrant search of Pinnow's hotel room yielded aluminum foil, one partially full and two empty bottles of isopropyl alcohol, store receipts listing precursor chemicals, an empty container of a cold medicine containing pseudoephedrine, and an unopened cold syrup containing pseudoephedrine. At his change-of-plea hearing, Pinnow admitted that he acquired these items and crushed the pseudoephedrine "in order to manufacture methamphetamine using what is known as the lithium ammonium reduction method."

At sentencing, the district court overruled Pinnow's objection to the § 2D1.1(b)(8)(B) enhancement, explaining that the amounts and types of precursors and the undisputed facts in the PSR "reveal the defendant traveling and living with a veritable toxic waste dump that was dangerous to himself as well as others." Turning to the sentence to be imposed, the court noted that Pinnow possessed the necessary precursors "and a very large quantity of pseudoephedrine pills," that he has been a "one-person crime spree" for the past 20 years, living in at least thirteen States, that he "has abused alcohol, marijuana, cocaine, methamphetamine, Valium, and LSD," and that he has a "continued history of violent criminal behavior." For these reasons, and "taking into account all the factors under [18 U.S.C. § 3553(a)]," the court

-3-

imposed a sentence of 175 months in prison, somewhat above the bottom of the advisory guidelines range of 168-210 months.

## II.

On appeal, Pinnow first argues that the district court erred in imposing the three-level enhancement under § 2D1.1(b)(8)(B) because "his mere possession of methamphetamine precursors and materials, did not create a substantial risk of harm to human life or the environment." We review *de novo* the application of the substantial risk of harm standard to the undisputed facts summarized in the PSR. See United States v. Underwood, 364 F.3d 956, 961, 969-70 (8th Cir. 2004); United States v. Davidson, 409 F.3d 304, 313 (6th Cir. 2005); United States v. Houchins, 364 F.3d 182, 187 (4th Cir. 2004), vacated on other grounds, 543 U.S. 1104 (2005).

In section 3612 of the Methamphetamine Anti-Proliferation Act of 2000, Congress directed the Sentencing Commission to amend the guidelines to provide an enhancement of "not less than 3 offense levels" for "any offense relating to the manufacture, attempt to manufacture, or conspiracy to manufacture amphetamine or methamphetamine . . . if the offense created a substantial risk of harm to human life . . . or the environment." Pub. L. No. 106-310, § 3612, 114 Stat. 1228-29 (2000). The legislative history explained:

> [T]hese chemicals and substances [used to manufacture methamphetamine] are utilized in a manufacturing process that is unstable, volatile, and highly combustible. Even small amounts of these chemicals, when mixed improperly, can cause explosions and fires. For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks, or sewage systems in an effort to conceal evidence of illegal manufacturing. More disturbing is that most of these laboratories are situated in residences,

motels, trailers, and vans, and often times are operated in the presence of children.

H.R. Rep. No. 106-878, pt. 1, at 22 (2000). The Sentencing Commission responded by promulgating what is now § 2D1.1(b)(8)(B). Application Note 20(A) to § 2D1.1 provides that, in determining "whether the offense created a substantial risk of harm to human life or the environment, the court shall include consideration of" the quantity of chemicals and toxic substances found at the laboratory, the manner in which those chemicals and substances were stored and disposed of, the duration of the offense, and the extent and location of the manufacturing operation.

The plain language of both § 2D1.1(b)(8)(B) and its authorizing legislation confirm that the substantial-risk-of-harm enhancement does not automatically apply to every offense involving methamphetamine manufacture. A panel of the Ninth Circuit has held that a district court "may not rest application of the enhancement on facts that are necessarily common to most or every manufacture" because analysis of the mandatory factors in Application Note 20(A) "demand[s] inquiry into the details of the particular case." United States v. Staten, 466 F.3d 708, 716 (9th Cir. 2006). We agree that the Note 20(A) factors may not be ignored and that the details of the particular offense are important. But the Note 20(A) factors are not exclusive, and Congress evidenced its intent that the Commission and sentencing courts take into account the dangers inherent in methamphetamine manufacturing. Therefore, we agree with the observation of the court in United States v. Dick, 173 F. Supp. 2d 765, 771 n.6 (E.D.Tenn. 2001), affirmed, United States v. Layne, 324 F.3d 464 (6th Cir.), cert. denied, 540 U.S. 888 (2003):

> Defendants argue [former] section 2D1.1(b)(6) creates a per se enhancement . . . . For heavily populated areas . . . Defendants are probably correct as a practical matter. Indeed, the legislative history of the enhancement suggests as much. Still, the Court can conceive of

circumstances in which the enhancement would not apply even in heavily populated areas, although such scenarios may not be realistic.

In this case, at the time of his arrest, Pinnow was in possession of a substantial quantity of pseudoephedrine, enough to manufacture fifty grams of pure methamphetamine, plus other chemicals and equipment used in the lithium ammonium reduction method of manufacture. The many risks to human life and to the environment from this method of manufacture are well known. See, e.g., United States v. Chamness, 435 F.3d 724, 727 (7th Cir. 2006); United States v. Allen, 297 F.3d 790, 796 (8th Cir. 2002). Though no active methamphetamine lab was uncovered, the presence of burnt aluminum foil with an unknown residue, a plastic pitcher containing an unknown brown substance, and empty isopropyl alcohol containers was strong evidence of recent manufacture. Moreover, Pinnow admitted that he possessed the precursors and equipment with the intent to manufacture methamphetamine. His hurried departure from the hotel with dangerous chemicals such as sulfuric acid, acetone, and starter fluid (which releases ether) is strong evidence of an offender who neither stored nor disposed of his toxic possessions in a safe manner. Compare Houchins, 364 F.3d at 188.

Finally, the items found in the hotel room, and the information that Pinnow had been staying in various hotels in the area, are strong evidence that manufacturing had been done, and would continue to be done, in urban areas where the substantial risk of harm to human life and the environment is greater. On this record, taking into account the factors enumerated in Application Note 20(A) as well as the dangers inherent in methamphetamine manufacture by this method, we agree with the district court that Pinnow's methamphetamine manufacturing offense warranted imposition of the § 2D1.1(b)(8)(B) enhancement because, unlike the peripheral defendants acquitted of 18 U.S.C. § 858 charges in Underwood, 364 F.3d at 962 n.4 and 970, his own actions created a substantial risk of harm to human life and the environment.

## III.

Pinnow next argues that his sentence is unreasonable. We disagree. The district court expressly took into account the sentencing factors in 18 U.S.C. § 3553(a) as well as the advisory guidelines range. Though recognizing that Pinnow has a strong employment history as a crane operator, the court emphasized that he has engaged in a twenty-year "crime spree" in thirteen States, has abused alcohol and numerous drugs, and has a history of violent criminal behavior. In these circumstances, the court was well within its discretion in imposing a sentence of 175 months in prison, which was a few months above the bottom of Pinnow's advisory guidelines range of 168-210 months but below the sentence the government urged the court to impose. See United States v. Lazenby, 439 F.3d 928, 931-32 (8th Cir. 2006) (standard of review).

The judgment of the district court is affirmed.

_____