# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

───────────

No. 06-3050

───────────

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Michael Paul Patterson, | * | |
| | * | |
| Defendant - Appellant. | * | |

───────────

Submitted: December 12, 2006
Filed: April 4, 2007

───────────

Before LOKEN, Chief Judge, MURPHY and SHEPHERD, Circuit Judges.

───────────

LOKEN, Chief Judge.

Michael Patterson entered a conditional plea of guilty to an indictment that charged him with being a felon in possession of a firearm, attempting to manufacture methamphetamine, possessing a sawed-off shotgun in furtherance of a drug offense, and manufacturing an unregistered firearm (a pipe bomb). The district court[1] sentenced Patterson to 207 months in prison, applying a six-level enhancement for causing a substantial risk of harm to the life of a minor in the commission of the methamphetamine manufacturing offense. Patterson appeals, challenging the denial

───────────

[1] The HONORABLE WILLIAM R. WILSON, JR., United States District Judge for the Eastern District of Arkansas

of his motion to suppress, the six-level enhancement, and the reasonableness of his sentence. We affirm.

**Suppression Issues.** At the suppression hearing, Officers Brad Cartwright and Robert Roe testified that they went to the residence of Patterson and his girlfriend, Kendra Fletcher, for a "knock and talk" after receiving an anonymous tip that Patterson and Fletcher were manufacturing and dealing methamphetamine at that location. When Fletcher opened the door, Cartwright said they were there to pick up a reported meth lab. Fletcher denied having a meth lab but consented to a search of the residence, invited the officers in, and signed a consent-to-search form. The officers explained that she could revoke her consent at any time.

The officers and Fletcher passed through the kitchen and into the living room, where Patterson was visiting with a friend, Randy Bearden. Patterson asked what was going on; Cartwright identified himself and said he was investigating a report of a meth lab there. Patterson said, "Go ahead and search. I don't mind. We don't have anything to hide." Cartwright saw a partially open closet door and asked Fletcher to turn on its light. When she did so, Cartwright saw in plain view a sawed-off shotgun and glass pipes for smoking methamphetamine. At this point, Fletcher said, "I don't think this is right." Cartwright asked Fletcher if she was revoking her consent to search. When Fletcher vacillated, Cartwright said they were stopping the search and would apply for a search warrant. After checking everyone's identification and learning that Patterson was a convicted felon, the officers arrested Patterson and Fletcher for possession of an illegal sawed-off shotgun and drug paraphernalia. They allowed Bearden to leave.

Patterson was promptly taken to jail. Fletcher was not taken to jail until her mother came to pick up Fletcher's three or four year old son, who also lived in the house. The residence was then secured while Cartwright and Roe applied for and obtained a search warrant. The warrant search uncovered multiple firearms, six grams

of methamphetamine, and a variety of chemicals and equipment used in the manufacture of methamphetamine. The pipe bomb was found in Fletcher's vehicle, where Patterson later admitted putting it.

Defense witnesses gave conflicting testimony at the suppression hearing. Fletcher testified that the officers pushed their way into the house and coerced her into signing a consent form she did not understand. Johnson Davis, Patterson's former boss, testified that, when Patterson called to ask for advice during the encounter, Davis told Patterson he did not have to consent to a search of his home without a warrant, and Davis then heard a belligerent officer say, "You either are going [to] let us search it and if you make us go get a warrant you are going to have to leave the premises." Patterson testified that Officer Cartwright looked in the closet without asking Patterson for consent. Fletcher's mother testified that, when she came to pick up the child, an officer was "digging through stuff in the closet" while Fletcher was telling him to stop searching.

Crediting the officers' testimony, the district court denied Patterson's motion to suppress, finding that both Fletcher and Patterson consented to Cartwright's search of the closet, where he found a sawed-off shotgun and drug paraphernalia that gave the officers probable cause to arrest Patterson and Fletcher and obtain a warrant to search the remainder of the residence and their vehicles.

On appeal, Patterson argues that the district court violated the Supreme Court's recent decision that "a warrantless search of a shared dwelling . . . over the express refusal of consent by a physically present resident cannot be justified . . . on the basis of consent given to the police by another resident." Georgia v. Randolph, 126 S. Ct. 1515, 1526 (2006). Here, had the district court credited Patterson's testimony that Officer Cartwright avoided asking Patterson for consent until after the closet search, we would need to construe and apply the Supreme Court's caveat that the police have no obligation "to take affirmative steps to find a potentially objecting co-tenant" when

one co-tenant has consented to the search. Randolph, 126 S. Ct. at 1527. But the district court did not credit Patterson's testimony, instead finding that Patterson expressly consented to a search of the closet. As that credibility finding is not clearly erroneous, Cartwright searched the closet with the consent of both Fletcher and Patterson, uncovering probable cause to arrest them both and to obtain a warrant to search the remainder of their residence. The motion to suppress was properly denied.

**The Sentencing Enhancement.** The advisory guidelines provide for a six-level enhancement if the methamphetamine manufacturing offense created a substantial risk of harm to the life of a minor. See U.S.S.G. § 2D1.1(b)(8)(C).[2] At Patterson's change-of-plea hearing, he admitted that the warrant search uncovered a propane bottle with torch, a can of butane fuel, a large quantity of 7% iodine tincture, a bottle of liquid fire, a bottle of peroxide, a bottle of lye, matchbooks, lighter fluid, and a beaker and a coffee pot containing liquids from which methamphetamine and pseudoephedrine were recovered.

At sentencing, Christy Sullivan, a forensic chemist with the Arkansas State Crime Laboratory, testified that she photographed these chemicals and equipment during the warrant search and then tested some of the items at the lab. Sullivan testified that the items included a pint glass jar half full of a yellow liquid on top and a brown "reaction sludge" on the bottom. When tested, the contents were found to contain methamphetamine, pseudoephedrine, phosphorus, iodine, and acid. Sullivan explained that the two layers of liquid meant "they actually have finished the cook and are getting ready to extract out the methamphetamine." In response to a question by the court, Sullivan opined that a meth lab "of this nature" would constitute a serious danger to a minor:

---

[2]After its adoption effective December 16, 2000, this provision was moved from § 2D1.1(b)(6)(B) to § 2D1.1(b)(5)(C) to § 2D1.1(b)(6)(C) to its present location, all without substantive change. See U.S.S.G. App. C, amendments 608, 620, 667, 681.

Just the chemicals that are there, the strong acids, the sulfuric acid, the bases that were found, all of those are skin irritants and can cause burns on the skin. Iodine, once it's in the elemental form, is a danger to . . . just anyone because it's a respiratory irritant. It actually will form acid in your lungs and decrease lung capacity. All the chemicals are either carcinogenic or of some nature like that, like mutagenic, they can cause mutations and birth defects. Anytime you have a strong acid or a base around a child, you have a danger because . . . most children don't know not to bother things of that nature, especially unmarked, in unmarked containers.

Based upon this evidence, the district court overruled Patterson's objection to the six-level enhancement, finding that "having these chemicals there did create a substantial risk of harm to a minor that's three or four years old."

On appeal, Patterson argues that the district court erred in applying this guidelines provision because the court at sentencing did not expressly apply Application Note 20(A) to § 2D1.1, which provides that "the court shall include consideration" of enumerated factors in determining whether an offense created a substantial risk of harm to human life or the environment. The Note 20(A) factors include the quantity of chemicals, the manner in which they were stored and disposed, the duration and extent of the manufacturing, the location of the laboratory (residential or remote), and the number of human lives placed at risk. We have recently noted that, while they are not exclusive, "the Note 20(A) factors may not be ignored and . . . the details of the particular offense are important." United States v. Pinnow, 469 F.3d 1153, 1157 (8th Cir. 2006).

In this case, the district court read the text of § 2D1.1(b)(8)(C) at sentencing. Neither counsel nor the court referred to Application Note 20(A), but the testimony of forensic analyst Sullivan, supported by Patterson's admissions at the change-of-plea hearing, addressed "the details of the particular offense." Her testimony specifically addressed the Note 20(A) factors most relevant to endangering the life of

Fletcher's young child -- the presence of an operating lab in a small duplex apartment in which the child was living, the nature of the chemicals that were present and the specific risks of harm they posed to the child, and the careless manner in which the chemicals were stored from the perspective of child safety. We decline to require a rote recitation of the Note 20(A) factors when, as here, the sentencing record makes clear that their substance has been adequately considered.[3] Moreover, were a rote recitation required, Patterson's failure to raise the issue at sentencing would mean review only for plain error. See generally United States v. Pirani, 406 F.3d 543, 549-50 (8th Cir.) (en banc), cert. denied, 126 S. Ct. 266 (2005). Here, the alleged error was not plain. Nor did it affect Patterson's substantial rights because the legislative history of the enhancement confirms that it was intended to apply to this offense. See Pinnow, 469 F.3d at 1156-57.

**Reasonableness of the Sentence.** Finally, Patterson argues that the sentence is unreasonable because the district court felt unduly bound by the advisory guidelines and therefore "must have" based the sentence on an unlawful presumption that a guidelines-range sentence is reasonable. Of course, the present law of this circuit is that a sentence within a properly determined advisory guidelines range is presumptively reasonable, an issue the Supreme Court of the United States currently has under review. Whether or not a guidelines range sentence is *presumptively* reasonable under United States v. Booker, 543 U.S. 220 (2005), the guidelines range is clearly entitled to some consideration. Here, after correctly determining that range, the district court found no reason to go lower and sentenced Patterson to 87 months

---

[3]We note that Application Note 20(A) applies to offenses described in § 2D1.1(b)(8)(B) as well as offenses described in § 2D1.1(b)(8)(C). No doubt for this reason, some of the Note 20(A) factors, such as the manner of chemical disposal, the likelihood of release into the environment, the extent of the manufacturing operation, and the number of human lives endangered, are of little significance in determining whether a methamphetamine manufacturing offense created a substantial risk of harm to the life of a particular minor child.

in prison, the bottom of that range, plus a consecutive ten-year mandatory minimum sentence for being a felon in possession of a sawed-off shotgun in furtherance of his drug trafficking offense. After careful review of the sentencing record, including Patterson's prior criminal history, we agree with the district court that this sentence is reasonable.

The judgment of the district court is affirmed.

_____