# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1430

_____

United States of America

*Plaintiff - Appellee*

v.

Michael Joe Wells, also known as Buster Wells

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: November 16, 2012
Filed: February 14, 2013

_____

Before RILEY, Chief Judge, WOLLMAN and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury convicted Michael Wells of one count of conspiring to manufacture 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846, and seven counts of possessing pseudoephedrine with the intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1). The district

court[1] sentenced Wells to 267 months' imprisonment. We affirm the convictions and the sentence.

## I.

In 2009, law enforcement officers received information that Wells was manufacturing methamphetamine at his home in Poplar Bluff, Missouri.[2] Officers obtained pseudoephedrine purchase logs that showed that from January 2008 to May 2009, Wells, his wife Tonya, and his adult daughter Mandy had purchased a large quantity of pseudoephedrine in suspicious patterns.[3]

On August 26, 2009, officers went to Wells's residence to execute an arrest warrant for him. While outside, the officers heard an explosion and saw a flash inside the residence. The officers entered the residence and found Wells in the kitchen, bent over the sink with the water running. A throw rug was on fire. The officers extinguished the fire and secured Wells, who had suffered minor burns on his chest. A search of the kitchen revealed a partially melted plastic soda bottle and a funnel, both of which are commonly used in the "shake and bake" method (in which the ingredients are placed in a soda bottle and then agitated) of manufacturing methamphetamine. The officers believed that Wells had dumped the contents of an active shake and bake methamphetamine laboratory down the kitchen sink, resulting in the explosion that singed his chest and ignited the throw rug.

---

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

[2]In United States v. Wells, 648 F.3d 671 (8th Cir. 2011), we affirmed the district court's order suppressing evidence obtained through searches of an outbuilding located on Wells's residential property.

[3]For convenience, we refer to Wells, Tonya, and Mandy collectively as "the Wells family."

At trial, Mandy testified that Tonya and Wells had asked her to purchase pseudoephedrine pills. Tonya asked Mandy to purchase pseudoephedrine pills for her shortly after she and Mandy began using methamphetamine together in late 2007 or early 2008. In exchange for methamphetamine, Mandy purchased pseudoephedrine for Tonya on at least six occasions. She also purchased pseudoephedrine pills for Wells approximately six times. Wells usually gave her money to buy the pills, which she typically purchased by traveling to neighboring towns. Mandy also testified that Wells gave her methamphetamine on several occasions.

The jury heard testimony that Wells had pleaded guilty in 2001 to attempting to manufacture methamphetamine after police pulled his car over and discovered numerous items used in the manufacture of methamphetamine, including pseudoephedrine.

The government called pharmacists to lay the foundation for the admission of pseudoephedrine purchase logs. The pharmacists explained that to purchase pseudoephedrine pills, a customer must present a government-issued photograph identification card. The pharmacy technician then records the date and time of the sale, the quantity of pseudoephedrine pills purchased, and the purchaser's name, address, and identification card or driver's license number. To complete the sale, the customer must sign a pseudoephedrine purchase log. The pharmacists testified that it was the practice of their employers to log pseudoephedrine purchases and that the logs were retained to comply with federal law. The district court admitted the pseudoephedrine logs over Wells's objection.

Lynda Hartwick, a forensic document examiner, testified that she had examined known samples of Wells's signature and compared them with pseudoephedrine logs that purported to bear Wells's signature. Hartwick stated that it was "highly probable" that the signatures were by the same author.

The government called Larry Gregory, a special agent with the Drug Enforcement Agency (DEA), and an expert in the field of clandestine methamphetamine laboratories. Gregory examined the pseudoephedrine logs pertaining to the Wells family and identified suspicious patterns. For example, Mandy purchased pseudoephedrine pills from two different pharmacies on the same day, Tonya and Wells purchased pseudoephedrine pills from the same pharmacy within minutes of one another on at least six occasions, the Wells family purchased a significant amount of pseudoephedrine pills within short periods of time, and purchased the pills from pharmacies far from their residence in Poplar Bluff. From January 2008, to May 2009, the Wells family purchased a total of 290.88 grams of pseudoephedrine. Over Wells's objection, Gregory testified that the patterns he identified in the pseudoephedrine logs were consistent with someone who was purchasing pseudoephedrine pills for use in the manufacture of methamphetamine.

The jury also heard testimony from the law enforcement officers involved with Wells's August 2009 arrest. The officers testified about their familiarity with the shake and bake method of manufacturing methamphetamine and the potential for explosions or flash fires associated with this method.

Robert Kreft, a senior forensic chemist with the DEA, testified as an expert in the area of clandestine methamphetamine laboratory science. Kreft had worked as a chemist for the DEA for 36 years, had received training concerning how to determine the manufacturing capacity of a clandestine methamphetamine laboratory, and had experience doing so. Kreft testified that pseudoephedrine is commonly used in the manufacture of methamphetamine. He played a laboratory-prepared video for the jury that illustrated the shake and bake method of manufacturing methamphetamine. Kreft explained that the explosive nature of the shake and bake method makes it dangerous and stated that pouring the contents of an active shake and bake laboratory down the sink could trigger an explosion or flash fire. He reported that the maximum theoretical yield for methamphetamine manufactured from

-4-

pseudoephedrine was 92 percent, but that an individual manufacturing methamphetamine in a clandestine laboratory would likely have a yield of from 20 to 80 percent, depending on the individual's skill and other factors. Kreft explained that an experienced methamphetamine cook will have a higher yield as a result of having refined his or her technique. He testified that it would be "very reasonable" for an experienced methamphetamine cook using the shake and bake method to obtain a yield of 50 percent of the theoretical maximum yield of 92 percent.

The jury found Wells guilty of all eight counts charged in the second superseding indictment. The district court denied Wells's motions for judgment of acquittal and a new trial. Wells's presentence report recommended a two-level leadership enhancement under United States Sentencing Guidelines (Guidelines) § 3B1.1(c), and a three-level enhancement under Guidelines § 2D1.1(b)(13)(C)(ii) because the offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life. Over Wells's objections, the district court applied the enhancements and imposed the earlier-described sentence.

## II.

### A. Evidentiary Issues

Wells argues that the district court erred by admitting the pseudoephedrine logs and certain portions of Gregory's testimony. "We review a district court's decision to admit evidence over objection for abuse of discretion." United States v. Johnson, 535 F.3d 892, 895 (8th Cir. 2008).

### 1. Pseudoephedrine Logs

Wells argues that the admission of the pseudoephedrine logs violates the Confrontation Clause of the Sixth Amendment, citing Melendez-Diaz v.

Massachusetts, 557 U.S. 305 (2009). Melendez-Diaz held that the admission of laboratory reports via "certificates of analysis" violated the Confrontation Clause because the certificates fell within the "class of testimonial statements" described in Crawford v. Washington, 541 U.S. 36 (2004). Melendez-Diaz, 557 U.S. at 309-310. In United States v. Mashek, 606 F.3d 922 (8th Cir. 2010), we rejected the same argument made here. We held that Melendez Diaz did not preclude the admission of pseudoephedrine logs because they constituted non-testimonial business records under Federal Rule of Evidence 803(6). Mashek, 606 F.3d at 930. The same analysis applies here, and the district court thus properly admitted the logs.

2.      Gregory's Testimony

Wells argues that the district court abused its discretion when it admitted special agent Gregory's testimony that the pseudoephedrine logs showed patterns consistent with the purchase of pseudoephedrine for the purpose of manufacturing methamphetamine. Specifically, Wells argues that the testimony was inadmissible under Federal Rule of Evidence 704(b), which precludes an expert from testifying as to "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged[.]" "Testimony that, when combined with other evidence, might imply or otherwise cause a jury to infer this ultimate conclusion, however, is permitted under the rule." United States v. Vesey, 338 F.3d 913, 916 (8th Cir. 2003).

Gregory's testimony focused on government Exhibit 30, which summarized the pseudoephedrine logs and displayed the Wells family's purchases on a calendar. The government identified particular groupings of pseudoephedrine pill purchases on the calendar and asked Gregory whether, given his training and experience, these groupings of purchases were significant. On several occasions, Gregory responded that "[t]his pseudoephedrine is being purchased to be used in the manufacturing of methamphetamine."

-6-

Wells argues that Gregory's testimony impermissibly commented on his intent. When viewed in its entirety, however, Gregory's testimony makes clear that his opinions concerning the pseudoephedrine logs were based on his knowledge of the purchasing patterns of someone using pseudoephedrine to manufacture methamphetamine, rather than on any special knowledge of Wells's thought processes. Before testifying about the pseudoephedrine logs in question, Gregory stated that he was looking for certain patterns and that Exhibit 30 would help him illustrate these patterns. Gregory explained that the patterns of someone who is purchasing pseudoephedrine pills to manufacture methamphetamine are different from the patterns of someone who is purchasing the pills for a legitimate purpose. The government then identified a particular grouping of pseudoephedrine pill purchases and asked Gregory whether, given his training and experience, the grouping of purchases was "consistent with someone who's buying pills for use in manufacturing methamphetamine." Gregory responded affirmatively. It was not until later in his testimony, after the government had asked him about the significance of other groupings, that Gregory began to respond that "[t]his pseudoephedrine is being purchased to be used in the manufacturing of methamphetamine." By then, however, Gregory's earlier testimony and the form of the government's questions had established that Gregory was merely describing the Wells family's pseudoephedrine pill purchasing patterns as consistent with someone who was purchasing the pills to manufacture methamphetamine. It was for the jury to draw from Gregory's testimony about the pattern of purchases the inference that Wells made the purchases with the intent to use the purchased products to manufacture methamphetamine.

B.     Sufficiency of the Evidence

Wells argues that the evidence at trial was insufficient to convict him either of conspiracy to manufacture 50 grams or more of methamphetamine as charged in count one, or of possession of pseudoephedrine with the intent to manufacture methamphetamine, as charged in counts two through eight. We review *de novo*

challenges to the sufficiency of the evidence. United States v. Espinoza, 684 F.3d 766, 776 (8th Cir. 2012). In conducting this review, we consider "the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." Id. (quoting United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006)). "We will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Yang, 603 F.3d 1024, 1026 (8th Cir. 2010). Additionally, "[w]hen a sufficiency argument hinges on the interpretation of a statute, we review the district court's statutory interpretation de novo." United States v. Reed, 668 F.3d 978, 982 (8th Cir. 2012) (quoting United States v. Gentry, 555 F.3d 659, 664 (8th Cir. 2009)).

### 1. Count One

To convict Wells of conspiring to manufacture methamphetamine, the government was required to prove beyond a reasonable doubt that: "(1) an agreement to manufacture methamphetamine existed; (2) [Wells] voluntarily and intentionally joined in the agreement, either at the outset or later; and (3) at the time he joined the agreement, [Wells] knew the purpose of the agreement was to manufacture methamphetamine." United States v. Malloy, 614 F.3d 852, 861 (8th Cir. 2010). Additionally, the government was required to establish that the conspiracy involved the drug quantity charged, in this case at least 50 grams of methamphetamine. See 21 U.S.C. § 841(b)(1)(A)(viii).

Wells argues that because a sales agreement, without more, does not constitute a conspiracy, see United States v. West, 15 F.3d 119, 121 (8th Cir. 1994), his providing Mandy with methamphetamine on several occasions is equally insufficient. Unlike the situation in West, Wells's providing Mandy with methamphetamine is not the only evidence that supports the existence of a conspiracy. "In a drug conspiracy case . . . the government is not required to present direct evidence of an explicit agreement; juries may rely upon circumstantial evidence to discern a tacit agreement

or understanding between the co-conspirators." United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010). The pseudoephedrine logs showed that from January 2008 to May 2009, the Wells family purchased a large quantity of pseudoephedrine pills. The patterns in which the Wells family purchased the pseudoephedrine pills—including Wells's and Tonya's purchases from the same store within minutes of one another, the practice of traveling a significant distance from their home in Poplar Bluff to purchase pills, and the purchase of an appreciable amount of pills within very short time periods—indicated that the Wells family was acting in concert and that the pseudoephedrine was being used to manufacture methamphetamine. Further, Mandy testified that Wells and Tonya each asked her to purchase pseudoephedrine pills for them, that Wells would give her money to purchase the pills, and that Tonya gave her methamphetamine in exchange for the pills. The evidence was thus more than sufficient to establish that Wells was guilty of conspiring to manufacture methamphetamine.

Wells also argues that the government failed to establish that the conspiracy involved at least 50 grams of methamphetamine. Specifically, he contends that it presented no evidence regarding the amount of methamphetamine his laboratory could produce. See United States v. Anderson, 236 F.3d 427, 430 (8th Cir. 2001) (per curiam) (holding that the relevant inquiry is the amount of methamphetamine that the conspirators themselves could produce). Kreft's testimony, however, established that the Wells family conspiracy involved at least 50 grams of methamphetamine.

As set forth above, Kreft testified that the maximum methamphetamine yield from pseudoephedrine is 92 percent. He explained that from that maximum yield, a methamphetamine cook could yield between 20 and 80 percent of methamphetamine, and that it would be reasonable for an experienced cook, using the shake and bake method, to yield 50 percent of the maximum 92 percent. Given Wells's experience as a methamphetamine cook, as evidenced by the length of the conspiracy and his prior conviction for attempting to manufacture methamphetamine, a reasonable jury

could find that he was capable of attaining a greater than 20 percent yield. Even using the 20 percent figure to calculate the amount of methamphetamine yielded from the 290.88[4] grams of pseudoephedrine, Wells's laboratory could produce more than 50 grams of methamphetamine.[5] The evidence was thus sufficient to establish that the conspiracy involved at least 50 grams of methamphetamine.

2.     Counts Two through Eight

Title 21 U.S.C. § 841(c)(1) makes it unlawful to knowingly or intentionally possess a listed chemical with the intent to manufacture a controlled substance. Section 802(34)(K) identifies pseudoephedrine as a listed chemical. Wells argues that the Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, 120 Stat. 192 (codified as amended in scattered sections of Title 21, among others) (CMEA) amended the Controlled Substances Act, 21 U.S.C. §§ 801-971, to exempt pseudoephedrine contained in over-the-counter medications from inclusion among the listed chemicals, but he has failed to establish that the CMEA affected the two statutory sections listed above. Because the government proved that he possessed pseudoephedrine, a listed chemical, with the intent to manufacture methamphetamine, his convictions for counts two through eight must stand.

C.     Sentencing

Wells contests the district court's calculation of his sentence, arguing that the district court erred by (1) imposing a two-level enhancement for a leadership role in

_____

[4]Wells speculates without evidentiary support that the 290.88 grams in pseudoephedrine figure is too high.

[5]With 290.88 grams of pseudoephedrine and a 20 percent yield of the maximum theoretical yield, Wells would produce approximately 53 grams of methamphetamine.

the offense, and (2) imposing a three-level enhancement for creating a substantial risk of harm to human life. "We review the district court's application of the Guidelines *de novo* and review its factual findings for clear error." United States v. Woodard, 694 F.3d 950, 953 (8th Cir. 2012).

1.      Leadership Role

Under Guidelines § 3B1.1(c), a district court may increase a defendant's offense level by two levels if the defendant "was an organizer, leader, manager, or supervisor in any criminal activity[.]" We construe these terms broadly, United States v. De Oliveira, 623 F.3d 593, 599 (8th Cir. 2010), and a defendant "may qualify for the enhancement if he directs the actions of only one other participant[,]" United States v. Umanzor, 617 F.3d 1053, 1060 (8th Cir. 2010). "Instructing others to obtain precursors used to produce methamphetamine is evidence of a managerial or supervisory role." United States v. Voegtlin, 437 F.3d 741, 748 (8th Cir. 2006).

The district court applied the two-level enhancement under Guidelines § 3B1.1(c) because it found that Wells had instructed his daughter Mandy to purchase pseudoephedrine pills. Wells argues that this finding was erroneous because it was Tonya, not Wells, who instructed Mandy to purchase pseudoephedrine pills. Although Mandy testified that Tonya asked her to buy pseudoephedrine pills, she also testified that she bought pseudoephedrine pills for Wells at his request on approximately six occasions, that Wells would give her money to purchase the pills, and that Wells gave her methamphetamine approximately six times. Given Mandy's testimony, the district court did not clearly err in finding that Wells had instructed Mandy to purchase pseudoephedrine pills and, accordingly, did not err in imposing the two-level enhancement. See Voegtlin, 437 F.3d at 748 (affirming Guidelines § 3B1.1(c) enhancement where defendant provided money for and instructed three people to obtain pseudoephedrine pills and bring them to him).

-11-

2.      Substantial Risk of Harm

Wells argues that the district court erred in applying Guidelines enhancement § 2D1.1(b)(13)(C)(ii) for creating a substantial risk of harm to human life. The substantial-risk-of-harm enhancement applies when "the offense involved the manufacture of amphetamine or methamphetamine and the offense created a substantial risk of harm to (I) human life . . . ." U.S.S.G. § 2D1.1(b)(13)(C)(ii). Application Note 18(B) to § 2D1.1 provides that the "court shall include consideration of" several enumerated factors when determining "whether the offense created a substantial risk of harm to human life or the environment[.]" Although not an exclusive list, United States v. Pinnow, 469 F.3d 1153, 1157 (8th Cir. 2006), these factors include: the quantity of chemicals found at the laboratory, the manner in which the chemicals were stored and disposed of, the duration and extent of the manufacturing operation, the location of the laboratory (residential or remote), and the number of human lives placed at risk.

At sentencing, the district court explained its rationale for imposing the substantial-risk-of-harm enhancement:

> All right. I understand the argument altogether, but I also heard the evidence, paid very close attention to the evidence about this, the explosion that occurred at the time of the arrest, and I find beyond a reasonable doubt that there was an explosion that did occur in this case due to the mishandling of the meth lab, and it occurred when the lab was disposed down the drain of the sink in the premises where the arrest took place. The Court finds also based on the evidence that an explosion actually occurred in this case, that the Defendant's conduct did, in fact, create a substantial risk of harm to human life. In the Court's view the Defendant himself is very fortunate that the meth lab didn't explode and cause severe injury or death to him.

-12-

Although the substantial-risk-of-harm enhancement "does not automatically apply to every offense involving methamphetamine manufacture[,]" Pinnow, 469 F.3d at 1156, the record in this case supports the district court's application of the enhancement. Several of the government's witnesses testified about the risk of explosion involved with the shake and bake method of manufacturing methamphetamine, a risk well demonstrated by the explosion of Wells's methamphetamine lab and the harm and fire resulting therefrom. Further, Wells conducted his meth lab operation in a residential area, where the risk of harm to human life is greater than in a remote, less populated area. Given these circumstances, the evidence was sufficient to support the district court's application of the substantial-risk-of-harm enhancement.

III.

The conviction and sentence are affirmed.

_____